

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

NO. 2-07-177-CR

JAMES ANTHONY DAVIS                                    APPELLANT

V.

THE STATE OF TEXAS                                          STATE

------------

FROM CRIMINAL DISTRICT COURT NO. 4 OF TARRANT COUNTY

------------

## OPINION

------------

### I. INTRODUCTION

A jury found Appellant James Anthony Davis guilty of murder and assessed his punishment at ninety-nine years' confinement. The trial court imposed a sentence in accordance with the jury's verdict. In eighteen points, Davis contends that this court should reverse the trial court's judgment and either acquit him or remand his case for a new trial. We will affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

In the early morning hours of January 28, 2006, Benbrook police received a 9-1-1 call from a woman screaming for help. After the woman stopped screaming, the 9-1-1 operators heard a young child saying, "he stabbed my momma." When police arrived at the apartment, they discovered the motionless bodies of Latarsha Hampton and James Davis. Latarsha, who had several stab wounds all over her body, including a fatal stab wound to her neck, was pronounced dead on the scene. Davis, who had cuts on both wrists, his neck, and an ear, was taken to the hospital and released into police custody later that day.

The police also discovered Latarsha's four-year old daughter, Tanoah Hampton, in the apartment that night. Although she was in shock, Tanoah was not physically harmed. Tanoah had witnessed that night's events.

The State charged Davis with Latarsha's murder. Based on Tanoah's statements about the murder, the discoveries of the police officers investigating the case, the conclusions of the medical examiners, and revelations about Latarsha and Davis's own personal history, police theorized that Davis was committing an act of domestic violence against Latarsha when he killed her and that he then attempted suicide. After a jury found Davis guilty of murder and

2

the trial court sentenced him to ninety-nine years' confinement, Davis perfected this appeal.

### III. POINTS OF ERROR PRESENTED

Davis presents the following eighteen points on appeal:

1.     The greater weight and preponderance of the evidence shows that Davis acted in self-defense.

2.     The evidence is insufficient to support the conviction because Davis acted in self-defense.

3.     The greater weight and preponderance of the evidence shows that Davis acted under the influence of a sudden passion.

4.     The trial court erred by denying Davis's request for a jury instruction on sudden passion.

5.     The trial court erred by sustaining the State's objection to one of Davis's jury arguments urging a unanimous verdict.

6.     The trial court erred by sustaining the State's objection to (another) one of Davis's jury arguments urging a unanimous verdict.

7.     The trial court erred by overruling Davis's objection to the State's jury argument for a non-unanimous verdict.

8.     The trial court erred by overruling Davis's motion for a mistrial based on an improper jury argument by the State.

9.     The trial court erred by overruling Davis's objection to the State's jury argument attacking Davis over the shoulders of his counsel.

10.     The trial court erred by overruling Davis's objection to the jury charge's failure to instruct the jury on self-defense.

11.     The trial court erred by overruling Davis's request for a jury instruction on self-defense.

12.     The trial court erred by overruling Davis's objection to the admissibility of a copy of the judgment and plea waivers from a prior case where Davis pleaded guilty to a charge of felon in possession of a firearm.

13.     The trial court erred by not permitting Davis to elicit on the cross-examination of a detective his opinion as to whether Davis's wounds were self-inflicted.

14.     The trial court erred by not permitting Davis to impeach a detective as to whether Davis's wounds were self-inflicted.

15.     The trial court erred by overruling Davis's objections to the competency of a child witness.

16.     The trial court erred by permitting the testimony of a child witness without determining whether the child was a competent witness.

17.     The trial court erred by overruling Davis's objections to the testimony of an officer who had responded to a previous incident of assault by Davis against Latarsha.

18.     The trial court erred by allowing one of Latarsha's friends to testify about Latarsha's statements to the friend concerning her relationship with Davis and her future plans.

We will address each of these points in the sequence most logical to the structure of our opinion.

## IV.  STANDARDS OF REVIEW

Many of the eighteen points raised by Davis involve application of the same standards of review.  To avoid redundancy in our opinion, we set forth

4

all applicable standards of review here and refer back to them as needed throughout this opinion.

## A. Legal Sufficiency

In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to the prosecution in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton*, 235 S.W.3d at 778. The trier of fact is the sole judge of the weight and credibility of the evidence. *See* TEX. CODE CRIM. PROC. ANN. art. 38.04 (Vernon 1979); *Margraves v. State*, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000).

Thus, when performing a legal sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the fact-finder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1131 (2000). Instead, we "determine whether

5

the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007). We must presume that the fact-finder resolved any conflicting inferences in favor of the prosecution and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Clayton*, 235 S.W.3d at 778.

### B. Factual Sufficiency

When reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light, favoring neither party. *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006); *Drichas v. State*, 175 S.W.3d 795, 799 (Tex. Crim. App. 2005). We then ask whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the fact-finder's determination is clearly wrong and manifestly unjust or whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the fact-finder's determination is manifestly unjust. *Watson*, 204 S.W.3d at 414–15, 417; *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000). To reverse under the second ground, we must determine, with some objective basis in the record, that the great weight and preponderance of all the evidence, though legally sufficient, contradicts the verdict. *Watson*, 204 S.W.3d at 417.

6

In determining whether the evidence is factually insufficient to support a conviction that is nevertheless supported by legally sufficient evidence, it is not enough that this court "harbor a subjective level of reasonable doubt to overturn [the] conviction." *Id*. We cannot conclude that a conviction is clearly wrong or manifestly unjust simply because we would have decided differently than the jury or because we disagree with the jury's resolution of a conflict in the evidence. *Id*. We may not simply substitute our judgment for the fact-finder's. *Johnson*, 23 S.W.3d at 12; *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). Unless the record clearly reveals that a different result is appropriate, we must defer to the jury's determination of the weight to be given contradictory testimonial evidence because resolution of the conflict "often turns on an evaluation of credibility and demeanor, and those jurors were in attendance when the testimony was delivered." *Johnson*, 23 S.W.3d at 8. Thus, we must give due deference to the fact-finder's determinations, "particularly those determinations concerning the weight and credibility of the evidence." *Id*. at 9.

### C. Requests for Submission of Defensive Theories

#### 1. Self-Defense

It is axiomatic that, when properly requested, the trial court must instruct the jury on every defensive theory raised by the evidence, and it makes no

difference whether such evidence or testimony was produced by the prosecution or the defense, or whether such defensive evidence or testimony might be strong, weak, unimpeached, or contradicted. *Ferrel v. State*, 55 S.W.3d 586, 591 (Tex. Crim. App. 2001)*; Smith v. State*, 676 S.W.2d 584, 586–87 (Tex. Crim. App. 1984). However, before a defendant is entitled to a jury instruction on self-defense, that defendant must provide some evidence that viewed in the light most favorable to the defendant will support the self-defense claim. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003); *Ferrel*, 55 S.W.3d at 591; *Hill v. State*, 99 S.W.3d 248, 250 (Tex. App.—Fort Worth 2003, pet. ref'd). In other words, a defendant must provide some evidence that he was statutorily authorized to use deadly force to defend himself. *See* Act of May 27, 1995, 74th Leg., R.S., ch. 235, § 1, sec. 9.32, 1995 Tex. Gen. Laws 2141, 2141 (amended 2007) (current version at TEX. PENAL CODE ANN. § 9.32 (Vernon Supp. 2008)) (setting forth the requirements for self-defense at the time applicable to this case).

### 2. Sudden Passion

During the punishment phase of the trial, a defendant may argue that he caused the death while under the immediate influence of sudden passion arising from an adequate cause. *See* TEX. PENAL CODE ANN. § 19.02(a)(1), (a)(2), (d) (Vernon 2003); *McKinney v. State*, 179 S.W.3d 565, 569 (Tex. Crim. App.

8

2005); *Hearne v. State*, No. 02-05-00291-CR, 2006 WL 2578196, at *1 (Tex. App.—Fort Worth Sep. 7, 2006, pet. ref'd.) (not designated for publication). "Sudden passion" is "passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." TEX. PENAL CODE ANN. § 19.02(a)(2). "Adequate cause" is a "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." TEX. PENAL CODE ANN. § 19.02(a)(1).

Sudden passion is a mitigating circumstance that, if found by the jury to have been proven by a preponderance of the evidence, reduces the offense from a first degree felony to a second degree felony. *Id.* § 19.02(c), (d); *McKinney*, 179 S.W.3d at 569. Thus, before a defendant is allowed a jury instruction on sudden passion, he must prove that there was an adequate provocation; that a passion or an emotion such as fear, terror, anger, rage, or resentment existed; that the homicide occurred while the passion still existed and before there was reasonable opportunity for the passion to cool; and that there was a causal connection between the provocation, the passion, and the homicide. *McKinney*, 179 S.W.3d at 569. The charge on sudden passion should be given if there is some evidence to support it, even if the evidence is

9

weak, impeached, contradicted, or unbelievable. *Trevino v. State*, 100 S.W.3d 232, 238 (Tex. Crim. App. 2003). However, the evidence should not be so weak, contested, or incredible that it could not support such a finding by a rational jury. *McKinney*, 179 S.W.3d at 569.

The mere fact that someone acts in response to provocation of another is insufficient to warrant a charge on sudden passion. *Trevino*, 100 S.W.3d at 241. Instead, the person's mental state must render him incapable of rational thought and collected action. *Kennedy v. State*, 193 S.W.3d 645, 653–54 (Tex. App.—Fort Worth 2006, pet. ref'd). The defendant must show some evidence that he was under the immediate influence of sudden passion. *Trevino*, 100 S.W.3d at 241; *see McKinney*, 179 S.W.3d at 570 (holding that the victim pushing and yelling at the defendant just before the shooting was not an adequate cause to give rise to an immediate influence of sudden passion because the fight began earlier in the day).

### D. Admission of Evidence

We review a trial court's decision to admit or to exclude evidence under an abuse of discretion standard. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000). A trial court does not abuse its discretion as long as the decision to admit or to exclude the evidence is within the zone of reasonable disagreement. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex.

10

Crim. App. 1990) (op. on reh'g). And it cannot be said that the trial court's decision falls outside that zone if it can be supported under any theory of law, regardless of whether the theory was raised at trial. *Lincicome v. State*, 3 S.W.3d 644, 649 (Tex. App.—Amarillo 1999, no pet.).

### E. Jury Argument

Four of the generally permissible areas for the State's jury argument include: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; and (4) plea for law enforcement. *Felder v. State*, 848 S.W.2d 85, 94–95 (Tex. Crim. App. 1992), *cert. denied*, 510 U.S. 829 (1993); *Alejandro v. State*, 493 S.W.2d 230, 231 (Tex. Crim. App. 1973). When evaluating an alleged improper argument, an appellate court views the statement in the context of the entire argument. *Mosley v. State*, 983 S.W.2d 249, 256 (Tex. Crim. App. 1998) (op. on reh'g), *cert. denied*, 526 U.S. 1070 (1999); *Tyler v. State*, No. 02-05-00389-CR, 2006 WL 1452536, at *2 (Tex. App.—Fort Worth May 25, 2006, no pet.).

When the trial court sustains an objection to improper jury argument and instructs the jury to disregard but denies a defendant's motion for a mistrial, the issue is whether the trial court abused its discretion in denying the mistrial. *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004). Ordinarily, any injury from an improper jury argument is obviated when the trial court instructs

11

the jury to disregard the argument, unless the remark is so inflammatory that its prejudicial effect cannot reasonably be removed by such an admonishment. *Melton v. State*, 713 S.W.2d 107, 114 (Tex. Crim. App. 1986); *see Gonzalez v. State*, 115 S.W.3d 278, 284 (Tex. App.—Corpus Christi 2003, pet. ref'd). Thus, only in extreme circumstances, when the prejudice caused by the improper argument is incurable, i.e., "so prejudicial that expenditure of further time and expense would be wasteful and futile," will a mistrial be required. *Hawkins*, 135 S.W.3d at 77 (quoting *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1070 (2000)); *see Simpson v. State*, 119 S.W.3d 262, 272 (Tex. Crim. App. 2003), *cert. denied*, 542 U.S. 905 (2004).

In determining whether the trial court abused its discretion by denying the mistrial, we balance three factors: (1) the severity of the misconduct (prejudicial effect), (2) curative measures, and (3) the certainty of conviction absent the misconduct. *Hawkins,* 135 S.W.3d at 77; *Mosley*, 983 S.W.2d at 259.

## V. LEGAL AND FACTUAL SUFFICIENCY OF THE EVIDENCE

In his first and second points, Davis contends that the evidence proved that he acted in self-defense when he stabbed Latarsha and that, therefore, the

evidence is insufficient to sustain the jury's guilty verdict.[1]  The evidence presented to the jury by the State included the testimony of an eyewitness, several police officers, medical examiners, and people who personally knew Davis and Latarsha.  Davis did not testify or call any witnesses on his behalf.

Latarsha's four-year old daughter, Tanoah, witnessed her mother's death. Tanoah testified that she was at home with her mother in their apartment when she heard her mother and her "daddy" (Davis) "fussing."  Tanoah went into the living room, where Davis and Latarsha were arguing.  She testified as follows:

Q.    Okay.  Tell us what happened next.

A.    They started fighting.

Q.    Okay.  Then what happened?

A.    Grabbed her hand -- saw my daddy kill my momma.

. . . .

Q.    Let me ask you this Tanoah, was your mommy hurt?

A.    Yes, sir.

---

[1] The State argues that we should not perform a sufficiency analysis because self-defense was not submitted to the jury.  The State contends that we cannot review the sufficiency of a claim not submitted to the jury. Construing Davis's first two points liberally, as we must, we treat them as straightforward challenges to the sufficiency of the evidence to support the jury's verdict finding him guilty of murder. *See* TEX. R. APP. P. 38.1(e) (requiring appellate court to treat issue as covering every subsidiary question that is fairly included).

13

Q. Tanoah, who hurt your mommy?

A. My daddy.

Q. And how did he hurt her?

A. My daddy had killed her.

During cross-examination, Tanoah additionally testified:

Q. Okay. When you came into the room, did mommy have a knife in her hand?

A. No, sir.

Q. Did daddy have a knife in his hand?

A. I don't know.

The jury additionally heard a recording of the 9-1-1 call Latarsha made that night. An audio forensic expert testified that the tape had recorded the words of a female caller who identified herself as Tasha Hampton.[2] The female could be heard on the tape crying, screaming, and saying, "[G]et off me." The female said, "[P]lease send help," "[P]lease . . . no more . . . no . . . not my child" (ellipses in 9-1-1 transcript), and "Just don't hurt her . . . it's over . . ." (ellipses in 9-1-1 transcript). Throughout the phone call, a screaming child and a male voice saying "hang up the phone" could be heard in the background.

---

[2] Testimony by Latarsha's mother and one of Latarsha's friends established that Latarsha went by Tasha.

14

The female caller did not say anything else, but the 9-1-1 tape recorded the child in the background saying, "You stabbed my momma" and "Daddy . . . you have bleed [sic] on me."

In addition to Tanoah's testimony and the 9-1-1 tape, the police officers on the scene that night testified. They explained that when they arrived both Latarsha's apartment doors were locked from the inside. They broke in through the back door and discovered Latarsha, Davis, and Tanoah in the apartment. Latarsha was on the floor in the living room; knife wounds were visible on her. Davis was on top of Latarsha; he had knife wounds to his wrists, neck, and an ear. Officer James Hatton testified that Tanoah was in a state of shock, but that later that night she told him that Davis had hurt Latarsha by "hitting" Latarsha with a knife in her neck. (Testimony from a medical examiner confirmed that the fatal wound on Latarsha was a knife wound to the neck). Tanoah also told police that Davis had pointed a gun at Latarsha and said, "I'm going to kill you." (Police discovered a loaded gun on the kitchen counter in the apartment). Tanoah reported that Latarsha had tried to run away, but that Davis had grabbed her.

Davis was transported from Latarsha's apartment to the hospital. Detective Jerry Graham testified that he met Davis at the hospital. Detective Graham testified that, although he did not view Davis's entire body, the

15

wounds he did see on Davis, including Davis's wrist and neck wounds, were in his opinion self-inflicted. Detective Graham did not testify about Davis's ear wound; he noted only that he had noticed blood in Davis's ear.

Medical examiner Dr. Nizam Peerwani performed the autopsy on Latarsha. Dr. Peerwani said that Latarsha had sustained seven stab wounds, including one to her neck, which was fatal. Dr. Peerwani classified several of the wounds as defensive—inflicted after Latarsha had curled into a defensive posture. One of the stab wounds, in fact, was in Latarsha's back. Other stab wounds were on Latarsha's hands and arms and were, in Dr. Peerwani's words, "consistent with a stab injury where a person is trying to protect the more vital and delicate parts of the body."

On cross-examination, Dr. Peerwani admitted that an attacker could also sustain defensive wounds. When presented with pictures of Davis's wounds, Dr. Peerwani indicated that he had not examined Davis and that too many variables existed to accurately ascertain much about the wounds from a picture. When pressed by Davis's attorney, however, Dr. Peerwani conceded that the cut to Davis's ear was not a typical self-inflicted wound; he testified that it was probably inflicted by someone else, but that Davis's neck wounds were probably self-inflicted.

16

Finally, Latarsha's friend Heather Reed testified that she had heard Davis threaten to kill Latarsha if she attempted to end their relationship. Heather overheard a cell phone conversation Latarsha had with Davis and said Davis was speaking to Latarsha in a violent manner. Other testimony established that Latarsha's apartment was strewn with boxes, making it look like someone was either moving in or moving out. Heather reported that Davis had moved a large television out of Latarsha's apartment and that someone was coming back to retrieve the remainder of Davis's belongings.

Davis's ex-wife, Jacqueline Anderson, testified that Davis spoke with her on the night of the murder. Davis reported that he and Latarsha were arguing. Davis had been staying in a motel room, but wanted to move back to Latarsha's apartment. Davis apparently did not have transportation of his own, and none of his friends would take him to Latarsha's apartment. In fact, Davis told his ex-wife that his friends offered to give him money to pay for additional nights in the motel so that he would not go to Latarsha's apartment. But Davis refused and instead took a cab to Latarsha's apartment that night. After presenting all of this evidence, the State closed its case in chief. Davis did not testify and did not call any witnesses on his behalf.

Applying the legal sufficiency standard of review to this evidence, viewing this evidence in the light most favorable to the prosecution, we hold

17

that a rational trier of fact could have found that Davis intentionally caused Latarsha's death. *See Clayton*, 235 S.W.3d at 778. Tanoah, an eye-witness, testified that Davis attacked and killed Latarsha. Tanoah's statements to police on the night of the murder indicated that Davis had stabbed Latarsha in the neck. Tanoah's testimony was corroborated by the 9-1-1 call placed by Latarsha that night, by the testimony of several police officers, and by the testimony of the medical examiner.

Applying the factual sufficiency standard of review, the evidence presented at trial that Davis intentionally caused Latarsha's death was not so weak that the jury's verdict was nonetheless clearly wrong and manifestly unjust. *See Watson*, 204 S.W.3d at 414–15, 417. No evidence exists in the record contradicting Tanoah's account of that night's events. Indeed, all of the evidence supports Tanoah's version of the facts—the only version of that night's events proffered at trial. Therefore, we cannot conclude that the great weight and preponderance of the evidence contradicts the jury's verdict. *See id*. Accordingly, we overrule Davis's first and second points.

## VI. DAVIS'S SELF-DEFENSE CLAIM

In his tenth and eleventh points, Davis claims that the trial court erred by refusing to instruct the jury on the law of self-defense.

According to the law in effect on the night of the murder,[3]

(a) A person is justified in using deadly force against another:

(1) if he would be justified in using force against the other under Section 9.31;

(2) if a reasonable person in the actor's situation would not have retreated; and

(3) when and to the degree he reasonably believes the deadly force is immediately necessary:

(A) to protect himself against the other's use or attempted use of unlawful deadly force; or

(B) to prevent the other's imminent commission of aggravated kidnaping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery.

Act of May 27, 1995, 74th Leg., R.S., ch. 235, § 1, sec. 9.32, 1995 Tex. Gen. Laws 2141, 2141 (amended 2007). Section 9.31, at the time that this statute was effective, provided that a person is justified in using force against

---

[3] Although the legislature has since amended sections 9.31 and 9.32, the offense for which the jury convicted Davis occurred on January 28, 2006, which was before the September 1, 2007 effective date of the amendments. Our analysis of Davis's appeal is therefore governed by the previous versions of these statutes. *See* Act of June 19, 1993, 73rd Leg., R.S., ch. 900, § 1.01, sec. 9.31, 1993 Tex. Gen. Laws 3586, 3598 *and* Act of May 27, 1995, 74th Leg., R.S., ch. 235, § 1, sec. 9.32, 1995 Tex. Gen. Laws 2141, 2141, *both amended by* Act of March 27, 2007, 80th Leg., R.S., ch. 1, § 5, 2007 Tex. Gen. Laws 1, 2 (codified as an amendment to TEX. PENAL CODE ANN. §§ 9.31, 9.32) (stating that an offense committed before the act's effective date is governed by the sections in effect when the offense was committed).

another when and to the degree he reasonably believes the force is immediately necessary to protect himself against the other's use or attempted use of unlawful force. *See* Act of June 19, 1993, 73rd Leg., R.S., ch. 900, § 1.01, sec. 9.31, 1993 Tex. Gen. Laws 3586, 3598 (amended 2007).

Thus, looking to the first of these requirements for a self-defense claim—applying the then-existing section 9.31 to section 9.32(a)(1)—Davis presented no evidence that his attack on Latarsha was necessary to protect himself from her. Indeed, the only testimony about what occurred in the apartment that night established that Latarsha did not have a knife in her hand. Davis argues, however that Dr. Peerwani's testimony—that a cut on one of Davis's ears was probably not self-inflicted[4]—is evidence that Latarsha attacked him. Assuming Dr. Peerwani's testimony gives rise to the inference claimed by Davis, Davis nonetheless failed to present any evidence that the force he used against Latarsha, which consisted of stabbing Latarsha seven times, several times while she was curled into a defensive position or trying to defend herself, was immediately necessary to protect himself. *See Ferrel*, 55 S.W.3d at 586.

Furthermore, no evidence exists that a reasonable person in Davis's situation would not have retreated. *See* Act of May 27, 1995, 74th Leg., R.S.,

---

[4] The State points out that Dr. Peerwani was not asked "whether the cut could have resulted when Appellant, who was left-handed, wielded a knife high up against his own throat so that the end of the knife cut his own right ear."

ch. 235, § 1, sec. 9.32, 1995 Tex. Gen. Laws 2141, 2141 (amended 2007). There was no testimony or evidence presented that Davis could not have simply left the apartment or moved into a different room to avoid Latarsha's supposed attack. In fact, the evidence established that when *Latarsha* called 9-1-1, Davis ordered her to hang up the phone; when *Latarsha* tried to run away, Davis grabbed her and pulled her back.

Viewing the evidence in the light most favorable to Davis, as we must under the applicable standard of review, no evidence exists that establishes Davis's entitlement to a self-defense charge, and the trial court did not err by refusing one. *See, e.g., Ferrel*, 55 S.W.3d at 591. We overrule Davis's tenth and eleventh points.

## VII. DAVIS'S SUDDEN PASSION CLAIM

In his third point, Davis argues that the greater weight and preponderance of the evidence shows that he acted under the influence of a sudden passion. Therefore, Davis suggests in his fourth point, the trial court erred by not including a sudden passion jury instruction during the punishment phase.

We have reviewed all of the evidence—viewing it as we must under the controlling standard of review—in the light most favorable to Davis to determine whether there is some evidence that an adequate provocation existed for Davis's conduct, that is, that a passion or an emotion such as fear, terror,

21

anger, rage, or resentment existed; that the homicide occurred while the passion still existed and before there was reasonable opportunity for the passion to cool; and that there was a causal connection between the provocation, the passion, and the homicide. *See* TEX. PENAL CODE ANN. § 19.02(a)(1), (a)(2), (d); *McKinney*, 179 S.W.3d at 569. No such testimony or evidence exists; indeed, Davis points to no evidence in the record indicating that Latarsha acted in a manner that would produce an emotion sufficient to render the mind of a person of ordinary temper incapable of cool reflection. *See* TEX. PENAL CODE ANN. § 19.02(a)(1), (a)(2), (d); *McKinney*, 179 S.W.3d at 569; *Kennedy*, 193 S.W.3d at 653–54. Therefore, the trial court did not err by denying Davis's request for a jury instruction on sudden passion. We overrule Davis's third and fourth points.

### VIII. DAVIS'S OBJECTIONS TO TESTIMONY DURING THE TRIAL

### A. Concerning the Admission of Tanoah's Testimony

In his fifteenth and sixteenth points, Davis contends that the trial court erred by allowing five-year-old Tanoah to testify. Davis generally argues that the trial court failed to determine whether Tanoah was a competent witness before allowing her testimony and thus erred. Davis also appears to argue that Tanoah was not competent to testify because she did not demonstrate that she understood that a penalty existed for not telling the truth.

22

A trial court's determination of whether a child witness is competent to testify and its ruling on the issue will not be disturbed on appeal absent an abuse of discretion. *Broussard v. State*, 910 S.W.2d 952, 960 (Tex. Crim. App. 1995), *cert. denied*, 519 U.S. 826 (1996); *De Los Santos v. State*, 219 S.W.3d 71, 80 (Tex. Crim. App.—San Antonio 2006, no pet.); *Woods v. State*, 14 S.W.3d 445, 450 (Tex. App.—Fort Worth 2000, no pet.). We review the child's responses to qualification questions as well as the child's entire testimony to determine whether the trial court's ruling constituted an abuse of discretion. *De Los Santos*, 219 S.W.3d at 80–81; *Fox v. State*, 175 S.W.3d 475, 481 (Tex. App.—Texarkana 2005, pet. ref'd); *Woods*, 14 S.W.3d at 451.

Rule 601 of the Rules of Evidence creates a presumption that a person is competent to testify. TEX. R. EVID. 601. The trial court has no duty to conduct a preliminary competency examination on its own motion. *McGinn v. State*, 961 S.W.2d 161, 165 (Tex. Crim. App. 1998). Once the competency of a child witness is challenged, the trial court must assure itself that the child has (1) the ability to intelligently observe the events in question at the time of the occurrence, (2) the capacity to recollect the events, and (3) the capacity to narrate the events. *Torres v. State*, 33 S.W.3d 252, 255 (Tex. Crim. App. 2000) (quoting *Watson v. State*, 596 S.W.2d 867, 870 (Tex. Crim. App. 1980)); *Hollinger v. State*, 911 S.W.2d 35, 38–39 (Tex. App.—Tyler 1995,

23

pet. ref'd). The third element, involving the capacity to narrate, requires that the witness is able to understand the questions asked, frame intelligent answers to those questions, and understand the moral responsibility to tell the truth. *Watson*, 596 S.W.2d at 870; *Hollinger*, 911 S.W.2d at 39.

After administering the oath to Tanoah, the trial court asked her a series of questions. Tanoah successfully answered questions concerning her name, age, and where she lived. She said that she knew what it was to tell the truth and to tell a lie. The trial court probed Tanoah's ability to distinguish the truth from a lie by asking, "If I were to tell you I had on a red tie, would that be the truth or would that be not the truth?" Tanoah, apparently correctly, answered "Not the truth." Furthermore, the trial court twice asked Tanoah whether she was going to tell the truth in court that day, and both times Tanoah confirmed that she was going to tell the truth.

One of Davis's chief complaints concerning the competency of Tanoah's testimony is that the trial court did not ask Tanoah whether she knew that there was a penalty for not telling the truth. But Davis has not cited any authority, and we have located none, requiring the trial court to question a child on the child's understanding of the punishment that will be inflicted should he or she lie. Thus, we cannot say that the trial court's failure to so question Tanoah rendered the decision to permit her to testify an abuse of discretion.

24

We have reviewed the body of Tanoah's testimony, and it demonstrates that Tanoah was able to intelligently observe the events on the night of her mother's death, and could, for the most part, recollect those events and narrate them. *See Watson*, 596 S.W.2d at 870; *Hollinger*, 911 S.W.2d at 38−39. Considering Tanoah's responses to the trial court's qualification questions as well as her testimony as a whole, we hold that the trial court did not abuse its discretion by finding Tahoah competent to testify. *See* TEX. R. EVID. 601(a)(2); *De Los Santos*, 219 S.W.3d at 80.

Davis also claims that the trial court erred by failing to make an explicit finding on the record that Tanoah was competent to testify. But after the trial court questioned Tanoah, it overruled Davis's objection to her competency and allowed the State to question her. Davis later re-urged his competency objection, and the trial court again overruled it. By overruling Davis's objections to Tanoah's competency and permitting Tanoah to testify, the trial court implicitly found Tanoah competent to testify. *See* TEX. R. APP. P. 33.1(a)(2)(A). Nothing more is required. We overrule Davis's fifteenth and sixteenth points.

### B. Concerning the Alleged Restriction of Cross-Examination of Detective Graham

25

In his thirteenth point, Davis contends that the trial court erred by "not permitting [him] to elicit on cross-examination of Detective Graham his opinion as to whether [Davis's] wounds were self-inflicted."

Detective Jerry Graham testified that he was the police officer who interviewed Davis at the hospital. Detective Graham testified that he saw the wounds to Davis's neck and to one of Davis's wrists and that he saw blood in Davis's ear. When asked by the prosecution, "Did you see any wounds on James Davis that would be classified as defensive wounds?," Detective Graham responded, "No, sir." But on cross-examination, Davis did specifically inquire into Detective Graham's opinion as to whether Davis's wounds were self-inflicted. Davis asked, "Of the wounds that you did see, you told us that they did not appear to be defensive as far as your opinion; is that correct?" Detective Graham answered, "Correct." On recross-examination Davis again asked, "Are you talking about the wounds that you saw on the wrist appeared to be self-inflicted?," to which Detective Graham answered, "Those appeared to be self-inflicted, yes."

Thus, Davis's complaint that the trial court erred by "not permitting [him] to elicit on cross-examination of Detective Graham his opinion as to whether [Davis's] wounds were self-inflicted" is not well-founded in the record. The record reflects that the trial court did permit Davis to cross examine Detective

26

Graham on his opinion as to whether Davis's wounds were self-inflicted. We overrule Davis's thirteenth point.

### C.  Concerning Exclusion of Statements Davis Made to Detective Graham

Davis alleges in his fourteenth point that the trial court erred by excluding statements that Davis made to Detective Graham; Davis claims the statements were admissible to impeach Detective Graham's opinion that the wounds he observed on Davis appeared to be self-inflicted. At the hospital, Davis told Detective Graham that he had cut his own wrists, but made multiple claims that Latarsha had slashed his neck. Detective Graham's report reflects these statements by Davis. Davis attempted to elicit testimony from Detective Graham concerning the statements Davis made at the hospital indicating that Latarsha had inflicted his neck wound. Davis conceded that his statements were hearsay but argued they were admissible under Texas Rules of Evidence 701–705 because they formed the basis of Detective Graham's opinion that his wounds were self-inflicted and to impeach Detective Graham. The trial court excluded the statements.

We review the trial court's ruling again applying the abuse of discretion standard of review. *See Santellan v. State*, 939 S.W.2d 155, 169 (Tex. Crim. App. 1997); *Montgomery*, 810 S.W.2d at 392. The parties concede that

27

Davis's statements to Detective Graham constitute hearsay.  *See* TEX. R. EVID. 801; *Allridge v. State*, 762 S.W.2d 146, 152 (Tex. Crim. App. 1988); *Chambers v. State*, 905 S.W.2d 328, 330 (Tex. App.—Fort Worth 1995, no pet.).  Davis claims, however, that the trial court should have admitted them pursuant to Texas Rule of Evidence 705(d).  That rule requires the trial court to exclude facts or data relied upon by an expert if "the danger that [the facts or data] will be used for a purpose other than as explanation or support for the expert's opinion outweighs their value as explanation or support or are unfairly prejudicial."  TEX. R. EVID. 705(d).

Thus, the trial court here was required to exclude Davis's statements to Detective Graham unless the value of the statements as an explanation or support for Detective Graham's expert opinion outweighed the danger that Davis's statements would be used for a purpose other than as an explanation of or support for the opinion.  *See id.*  As with a rule 403 balancing test, a trial court need not conduct a 705(d) balancing test on the record.  *See Valle v. State*, 109 S.W.3d 500, 506 (Tex. Crim. App. 2003) (applying a form of analysis traditionally used in a rule 403 balancing test to rule 705); *Yates v. State*, 941 S.W.2d 357, 367 (Tex. App.—Waco 1997, pet. ref'd) (holding that a trial court need not perform a 403 balancing test on the record); *Luxton v. State*, 941 S.W.2d 339, 343 (Tex. App.—Fort Worth 1997, no pet.)

28

(presuming that the trial court mentally conducted a 403 balancing test even though it was not explicitly done on the record).

Detective Graham testified:

Q.  And, in your opinion, was [the neck wound] a self-inflicted wound?

A.  With the wound starting deeper on this side and getting narrow toward the neck and rounding to the front, yes, sir, I believe it was self-inflicted.[5]

Outside the presence of the jury, while the trial court considered the admissibility of Davis's statements to Detective Graham, Detective Graham testified:

Q.  Detective Graham, you testified as to whether the wounds were self-inflicted or not.  Did part of the information in which you make that opinion come from talking to my client?

A.  No, sir.

. . . .

Q.  Okay.  And you're saying that what he told you played no part in the opinion you've just expressed to the jury about self-inflicted wounds?

A.  Yes, it did play a part.

Q.  So it was part of your opinion that you just told the jury?  It helped you form that opinion?

---

[5] Testimony was unclear as to whether there was one big neck wound or two smaller neck wounds.

A. Yes, sir.

A little later, the following exchange occurred:

THE COURT: While ago you talked about -- you were talking about self-inflicted wounds?

THE WITNESS: Yes, sir.

THE COURT: And you stated that you thought they were self-inflicted, is that correct?

THE WITNESS: Yes, sir.

THE COURT: Because he told you. Are you talking about his wrist wounds about being self-inflicted, is that correct, or are you talking about his wrist wounds along with his neck wounds?

THE WITNESS: I believe that they were all three self-inflicted.

We cannot hold that the trial court abused its discretion by concluding the value of Davis's statements to Detective Graham as an explanation or support for Detective Graham's opinion did not outweigh the danger that Davis's statements would be used for a purpose—that is, as substantive evidence—other than as an explanation or support for Detective Graham's opinion. *See* TEX. R. EVID. 705; *Valle*, 109 S.W.3d at 505–06. This is especially true because (1) Detective Graham gave conflicting testimony on whether he considered Davis's statement in forming his opinion and ultimately admitted that he did not believe Davis but rather that, based on his observations and experience, he believed all of the wounds were self-inflicted;

30

and (2) Davis candidly concedes that he wanted his statements to Detective Graham admitted because they were "an integral part of the Appellant's self-defense claim."  Thus, Davis admits that the value of the statements was not as an "explanation or support" for Detective Graham's opinion, but rather as substantive evidence to advance his own self-defense claim—a purpose rule 705(d) aims to *prevent*.  *See Valle*, 109 S.W.3d at 505–06 (quoting *Cole v. State*, 839 S.W.2d 798, 815 (Tex. Crim. App. 1990) (Maloney, J. concurring on rehearing) ("One of the greatest dangers in allowing otherwise inadmissible evidence under Rule 705 is that the jury will consider the facts and data as substantive evidence rather than as merely constituting the underlying basis for the expert's opinion")).

Davis additionally argues that the trial court should have permitted him to "impeach" Detective Graham with the statements "under the rules in Chapter 6 of the Texas Rules of Evidence."  Presuming that a citation to nothing more specific than "Chapter 6" is sufficient to meet the briefing requirements of Texas Rule of Appellate Procedure 38.1(h), we cannot agree that *Davis's* statements here have any value to impeach *Detective Graham*.  Davis claims that "Det. Graham interviewed the Appellant in his hospital bed and determined that some of the wounds suffered by the Appellant were no[t] self-inflicted which was contrary to his expressed opinion before the jury."  The record,

31

however, establishes that Detective Graham was always of the opinion that Davis's wounds were self-inflicted; the statements in Detective Graham's report indicating that Davis's wounds were not self-inflicted were statements by Davis himself, not by Detective Graham. Thus, we cannot agree that the trial court abused its discretion by prohibiting Davis from impeaching Detective Graham with Davis's statements that Latarsha slashed his neck. Having concluded that the trial court did not abuse its discretion by ruling Davis's hearsay statements inadmissible under rule 705 or as impeachment evidence, we overrule Davis's fourteenth point.

### D. Concerning Officer Mullinax's Testimony

In his seventeenth point, Davis contends that the trial court erred by admitting Officer Michael Mullinax's testimony. Approximately six months before Latarsha's death, Officer Mullinax responded to a 9-1-1 call made by Latarsha. When Officer Mullinax responded to Latarsha's prior 9-1-1 call, Latarsha made various statements to him. Davis timely objected to Officer Mullinax's testimony concerning Latarsha's statements on hearsay and "cross-examination and confrontation" grounds. The trial court overruled Davis's objections, but granted him a running objection. Davis contends that the trial court erred by overruling his objections.

32

Officer Mullinax testified that when he arrived at Latarsha's apartment, she told him that she and Davis had gotten into an argument, that she had asked Davis to leave, and that Davis had become angry and pushed her into a wall. Latarsha further told Officer Mullinax that she had hit her head on the wall, fallen to the ground, and cut her finger. She showed the cut to Officer Mullinax. Latarsha explained that when she had tried to call the police Davis had pulled the phones from the wall; after a friend arrived, Latarsha used the friend's cell phone to call 9-1-1. Officer Mullinax spoke with Latarsha as they stood outside her apartment; Davis was not present because he had left the apartment. Later, however, while Officer Mullinax was still at Latarsha's apartment, Davis returned and was arrested.

*1. Hearsay Objection to Officer Mullinax's Testimony*

We review a trial court's ruling on the admissibility of an out-of-court statement under the exceptions to the general hearsay exclusion rule for an abuse of discretion. *Zuliani*, 97 S.W.3d at 595. Hearsay is a statement, other than the one made by the declarant while testifying at a trial or hearing, offered into evidence to prove the truth of the matter asserted. TEX. R. EVID. 801(d). In order for hearsay to be admissible, it must fit into an exception provided by a statute or the Rules of Evidence. *Id.* 802; *Zuliani*, 97 S.W.3d at 595. One such exception is rule 803(2)—the excited utterance exception. An "excited

33

utterance" is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." TEX. R. EVID. 803(2).

In determining whether a hearsay statement is admissible as an excited utterance, the court may consider the time elapsed and whether the statement was in response to a question. *Zuliani*, 97 S.W.3d at 595; *Salazar v. State*, 38 S.W.3d 141, 154 (Tex. Crim. App. 2001). However, it is not dispositive that the statement is an answer to a question or that it was separated by a period of time from the startling event; these are simply factors to consider in determining whether the statement is admissible under the excited utterance hearsay exception. *Zuliani*, 97 S.W.3d at 596.

The critical determination is "whether the declarant was still dominated by the emotions, excitement, fear, or pain of the event" at the time of the statement. *Zuliani*, 97 S.W.3d at 596. Stated differently, a reviewing court must determine whether the statement was made "under such circumstances as would reasonably show that it resulted from impulse rather than reason and reflection." *Id.* (quoting *Fowler v. State*, 379 S.W.2d 345, 347 (Tex. Crim. App. 1964)).

Here, the evidence established that when Officer Mullinax responded to Latarsha's 9-1-1 call he found Latarsha "clearly upset," her hands were shaking

34

badly, and she was crying. The record does not indicate what period of time elapsed between the altercation and Latarsha's statement, but a reasonable inference exists that 9-1-1 response time is fairly quick. Based on these facts, we cannot say that the trial court acted outside the zone of reasonable disagreement by overruling Davis's hearsay objection to Officer Mullinax's recitation of Latarsha's hearsay statement that Davis had gotten angry and pushed her into a wall and by admitting it as an excited utterance.[6] *See, e.g., Zuliani*, 97 S.W.3d at 596 (holding that the statements of a "scared to death" declarant whispering "help me" to police officers twenty hours after being assaulted were excited utterances); *Jackson v. State*, 110 S.W.3d 626, 634 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd) (holding that the statements of a recently assaulted, "very upset," and crying assault victim were excited utterances); *see also Reyes v. State*, 48 S.W.3d 917, 920 (Tex. App.—Fort Worth 2001, no pet.); *Bondurant v. State*, 956 S.W.2d 762, 766 (Tex. App.—Fort Worth 1997, pet. ref'd).

## 2. Confrontation Clause Objection to Officer Mullinax's Testimony

---

[6] Although the trial court did not explicitly find that the statement was an excited utterance (the trial court gave no basis for its overruling of Davis's objection), we nevertheless uphold the trial court's ruling on an evidentiary matter if it is correct on any theory of law applicable to the case. *See McDuff v. State*, 939 S.W.2d 607, 619 (Tex. Crim. App. 1997).

Whether Officer Mullinax's testimony violated Davis's Confrontation Clause rights, however, is an altogether separate inquiry from whether the testimony was properly admitted under the rules of evidence. *See Wall v. State*, 184 S.W.3d 730, 742 (Tex. Crim. App. 2006) (recognizing statement could be admissible as an excited utterance and still constitute a testimonial statement for purposes of a Confrontation Clause analysis). Thus, we next conduct an analysis of whether the trial court erred by overruling Davis's Confrontation Clause objection to Officer Mullinax's testimony.

Recently, in a case involving facts similar to the present facts, the Court of Criminal Appeals explained that the proponent of evidence ordinarily has the burden of establishing the admissibility of the proffered evidence. *Vinson v. State*, 252 S.W.3d 336, 339 (Tex. Crim. App. 2008). Once an objection is made, the proponent must demonstrate by a preponderance of the evidence that the proffered evidence overcomes the stated objection. *Id.* at 340 n.14 (quoting *Bourjaily v. United States*, 483 U.S. 171, 175, 107 S. Ct. 2775, 2778 (1987)).

We review a constitutional legal ruling, such as whether a statement is testimonial or nontestimonial, de novo. *Lilly v. Virginia*, 527 U.S. 116, 137, 119 S. Ct. 1887, 1900 (1999); *Vinson*, 252 S.W.3d at 339; *Wall*, 184 S.W.3d at 742. This is particularly so because the legal ruling of whether a statement

36

is testimonial under *Crawford* is determined by the standard of an objectively reasonable declarant standing in the shoes of the actual declarant. *Wall*, 184 S.W.3d at 742–43. On that question trial judges are no better equipped than are appellate judges, and the ruling itself does not depend upon demeanor, credibility, or other criteria peculiar to personal observation. *Id*. "[T]he surrounding circumstances relevant to a Sixth Amendment admissibility determination do not include the declarant's in-court demeanor (otherwise the declarant would be testifying) or any other factor uniquely suited to the province of trial courts." *Lilly*, 527 U.S. at 137, 119 S. Ct. at 1900. Therefore, an appellate court reviews de novo whether, on the record before it, the State overcame a defendant's Confrontation Clause objection by a preponderance of the evidence. *Id.*; *Vinson*, 252 S.W.3d at 340.

The Confrontation Clause of the Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. Even when hearsay offered against a defendant is admissible under evidentiary rules, that evidence may implicate the Confrontation Clause of the Sixth Amendment if the defendant is not afforded the opportunity to confront the out-of-court declarant. *Gonzalez v. State*, 195 S.W.3d 114, 116 (Tex. Crim. App.), cert. denied, 127 S. Ct. 564 (2006).

37

In *Crawford v. Washington*, the Supreme Court held that the Confrontation Clause barred the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify and the defendant had had a prior opportunity for cross-examination." 541 U.S. 36, 53–54, 124 S. Ct. 1354, 1365 (2004). The Court later clarified what qualified as a "testimonial" statement in *Davis v. Washington*, where it established:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

547 U.S. 813, 822, 126 S. Ct. 2266, 2273–74 (2006).

The issue here in determining whether Latarsha's statements to Officer Mullinax were testimonial is whether, at the time Latarsha made the statements, circumstances were present that would indicate the existence of an ongoing emergency. *See Vinson*, 252 S.W.3d at 339. We look to the nonexclusive factors of (1) whether the situation was still in progress; (2) whether the questions sought to determine what is presently happening as opposed to what has happened in the past; (3) whether the primary purpose of the interrogation was to render aid rather than to memorialize a possible crime;

38

(4) whether the questioning was conducted in a separate room, away from the alleged attacker; and (5) whether the events were deliberately recounted in a step-by-step fashion. *See Vinson*, 252 S.W.3d at 339 (citing *Davis*, 547 U.S. at 822, 126 S. Ct. at 2274–75). Each of these factors establishes the testimonial nature of Latarsha's statements to Officer Mullinax. First, the situation was not still in progress; Davis had left the apartment before Officer Mullinax arrived. Second, because the situation had concluded, Officer Mullinax's questions to Latarsha were about what had already happened. Third, the primary purpose of the interrogation was to memorialize the assault committed by Davis—in fact Davis was arrested that day based on Latarsha's statements. Fourth, Latarsha and Officer Mullinax spoke outside Davis's presence and fifth, Latarsha did recount the events in a step-by-step fashion. Consequently, applying a de novo standard of review to the trial court's legal question of whether Latarsha's statements to Officer Mullinax were testimonial, we hold that they were. *See Vinson,* 252 S.W.3d at 339 (applying these factors and holding statements made by victim to officer responding to 9-1-1 call were testimonial); *Mason v. State*, 225 S.W.3d 902, 911 (Tex. App.—Dallas 2007, pet. ref'd) (statements given to a police officer responding to a 9-1-1 call reporting domestic violence were testimonial).

Our holding that Latarsha's statements to Officer Mullinax were testimonial does not, however, end our analysis. In both *Crawford* and *Davis*, the United States Supreme Court recognized that the equitable exception of forfeiture by wrongdoing "extinguishes confrontation claims." *Davis*, 547 U.S. at 833, 126 S. Ct. at 2280; *Crawford*, 541 U.S. at 62, 124 S. Ct. at 1370. That is, one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation. *Davis*, 547 U.S. at 833, 126 S. Ct. at 2280. Consequently, we must analyze whether Davis forfeited his constitutional right to confront Latarsha by killing her.

The forfeiture by wrongdoing doctrine dates back to the 1600s and has been firmly rooted in Supreme Court jurisprudence since the late 1800s. *See Reynolds v. United States*, 98 U.S. 145 (1878)*; Lord Morely's Case*, 6 State Trials 769 (1666). In fact, until recently, the leading American case on the forfeiture doctrine was *Reynolds*, handed down by the Supreme Court in 1878. *See Reynolds*, 98 U.S. 145. In *Reynolds*, the Court explained that the rule "has its foundation in the maxim that no one shall be permitted to take advantage of his own wrong . . . [the doctrine] is the outgrowth of a maxim based on the principles of common honesty." *Id.* Thus, this "essentially equitable" principle mandates that "one who obtains the absence of a witness by wrongdoing

40

forfeits the constitutional right to confrontation." *Davis*, 547 U.S. at 833, 126 S. Ct. at 2280.

As the rule evolved in the nation's case law after *Reynolds*, courts agreed that forfeiture required (1) the declarant's unavailability (2) as a result of the defendant's act of misconduct. *Gonzalez*, 195 S.W.3d at 120. Courts disagreed, however, on whether there must be an additional showing that the defendant's actions were undertaken *for the purpose of* preventing the witness from testifying at trial. *See id.* at 121–25 (setting forth an extremely thorough examination of the doctrine's development across state and federal courts).

During the pendency of this appeal, the Supreme Court resolved the issue and held that such an additional showing is required for the forfeiture doctrine. *Giles v. California*, 128 S. Ct. 2678, 2683 (2008). That is, a defendant does not waive his Confrontation Clause rights under the forfeiture by wrongdoing exception unless the defendant engaged in the wrongful conduct specifically for the purpose of preventing the witness from testifying. *Id.*

Here, there is no evidence that Davis murdered Latarsha to prevent her from testifying. Therefore, applying the United States Supreme Court's holding in *Giles*—which is binding on this court—to the present facts, and in the absence of evidence that Davis killed Latarsha specifically to prevent her from testifying, we cannot hold that Davis forfeited his right to confront Latarsha by

41

killing her. *See id.* Having held that Davis timely asserted a Confrontation Clause objection to Officer Mullinax's testimony, that Latarsha's statements to Officer Mullinax were testimonial, and that—applying the holding in *Giles*—Davis did not forfeit his right to confront Latarsha by killing her, we hold that the trial court erred by overruling Davis's Confrontation Clause objection to Officer Mullinax's testimony about Latarsha's statements to him.

Having found error, we must conduct a harm analysis to determine whether the error is harmless. TEX. R. APP. P. 44.2(a). Because the error is constitutional, we apply rule 44.2(a), under which we must reverse unless we determine beyond a reasonable doubt that the error did not contribute to appellant's conviction or punishment. TEX. R. APP. P. 44.2(a). In applying a rule 44.2(a) harm analysis to hearsay erroneously admitted over the defendant's Confrontation Clause objection, the Court of Criminal Appeals has instructed us that if the verdict or punishment would have been the same absent the error then the error is harmless. *Clay v. State*, 240 S.W.3d 895, 904 (Tex. Crim. App. 2007) (reversing appellate court's conclusion that hearsay erroneously admitted over Confrontation Clause objection was not harmless under rule 44.2(a) standard). In our assessment of the likelihood that, absent the trial court's error, the jury's verdict as to appellant's conviction and punishment would have been the same, we must consider the entire record. *Id*. Among the

factors, as revealed by the record, that we must consider are: (1) the importance of the hearsay evidence to the State's case; (2) whether the hearsay evidence was cumulative of other evidence; (3) the presence or absence of other evidence corroborating or contradicting the hearsay evidence on material points; and (4) the overall strength of the State's case. *Id*.; *Scott v. State*, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007). We must also consider any other factor, as revealed by the record, that may shed light on the probable impact of the trial court's error on the minds of average jurors. *Clay*, 240 S.W.3d at 904 .

Here, the hearsay (Latarsha's statements to Officer Mullinax) was not important to the State's case. The hearsay did not establish any element of the offense of the charged murder; instead the hearsay involved a prior 9-1-1 call made by Latarsha. Although the hearsay was not "cumulative," it was similar in nature to the testimony of Benbrook Police Officer Walter Keffer. Officer Keffer testified that just four days before the murder, he was dispatched to Latarsha's apartment based on a 9-1-1 call reporting an unwanted person at her apartment. He met with Latarsha and Davis and took Davis away from the apartment. Additionally, the hearsay was similar in nature to testimony provided by Latarsha's friend Heather Reed. Heather testified extensively about Davis's conduct towards Latarsha. Heather testified that she had heard Davis

43

verbally abuse Latarsha on multiple occasions, yelling that Latarsha would never leave him except in a body bag and threatening to blow up Latarsha's apartment if she tried to leave him. And another of Latarsha's friends, Kimberly Hudson, testified that Davis had a volatile temper and called Latarsha his "investment" and that on the night of the murder as she stood waiting for someone to answer her knock on the door of Latarsha's apartment she overheard Latarsha saying, "no, no, James, no." Thus, although Latarsha's exact hearsay statements to Officer Mullinax were not technically "cumulative of" or "corroborated by" other evidence, the inferences the jury was likely to draw from Latarsha's statements to Officer Mullinax are the exact same inferences the jury likely did draw from the other testimony, outlined above, that was admitted. Finally, the State's case against Davis was very strong. An eyewitness—Tanoah—testified that Davis stabbed Latarsha in the neck. Tanoah's version of the events was corroborated by the 9-1-1 tape made when Latarsha called police during Davis's attack. And when police arrived at the scene, all of the apartment doors were locked from the inside and only Tanoah, Latarsha, and Davis were inside the apartment. Testimony from police officers and the medical examiner further confirmed the accuracy of the events as explained by Tanoah. Reviewing the entire record in a neutral manner and applying the factors as instructed by the Court of Criminal Appeals in *Clay,* we

hold beyond a reasonable doubt that the trial court's error in admitting Officer Mullinax's testimony about the hearsay statements Latarsha made to him when he responded to her 9-1-1 call approximately six months before her murder did not contribute to Davis's conviction or punishment. *See* TEX. R. APP. P. 44.2(a); *Clay*, 240 S.W.3d at 904. Accordingly, we overrule Davis's seventeenth point.

### E. Concerning Heather Reed's Testimony

In his eighteenth point, Davis contends that the trial court erred by admitting the testimony of Heather Reed, a close personal friend of Latarsha. Heather testified about Latarsha and Davis's relationship. Davis objected to various portions of Heather's testimony, as set forth below, urging (as he does on appeal) that the testimony was hearsay and violated his Confrontation Clause rights.

1.  Heather testified that in October 2005 Latarsha came to Heather's apartment and asked if she and Tanoah could stay the night because Davis was being verbally abusive. Heather said yes, and while Latarsha was at Heather's apartment, Davis called Latarsha several times. According to Heather, Latarsha would "hang up and hang up, then she'd speak to him, 'I can't talk to you when you're like this.'"

2.  Heather testified that she overheard a phone conversation around Valentine's day of 2005 between Davis and Latarsha. Heather said that she heard Davis "talking real violent to [Latarsha]" and calling her names. Heather testified that she knew this because "[Latarsha's] cell phone was turned up real loud, you could hear everything when the cell phone is turned up loud."

45

3.  Heather testified that later the same day she went to Latarsha's apartment and heard Davis tell Latarhsa, "It'll never be over, it'll never be over. The only way you're going to leave me is one way." Davis later added, "The only way you're going to leave me is in a body bag."

4.  Heather testified that she overheard another cell phone call between Latarsha and Davis in October 2005 and heard "[Davis] threaten[] [Latarsha] again talking about the only way you're going to leave me is in a body bag."

5.  Heather testified that she had never known Davis to work and that Latarsha paid all the household bills.

6.  Heather testified that Latarsha was in medical school when she met her and that Latarsha was planning on going back to medical school.

7.  Heather testified that Davis had proposed marriage to Latarsha, but that Latarsha wanted to take a "wait and see" approach.

8.  Heather testified that, on the day of Latarsha's death, she went to Latarsha's apartment and noticed that Latarsha's television set was missing. According to Heather, she asked Latarsha, "Where is your TV at?" Latarsha responded, "[Davis] took it, he and a friend come over and took it." Latarsha additionally related that Davis had a friend come over to the house to get the rest of his belongings.

On appeal, Davis claims that the trial court erred by admitting Heather's testimony recited above because the itemized testimony constitutes hearsay and violates his Confrontation Clause rights. Davis, however, did not object at trial to Heather's testimony as set forth in paragraphs 5, 6, 7, and 8. Therefore, these complaints are forfeited on appeal. *See* TEX. R. APP. P. 33.1(a)(1).

46

Heather's testimony, as reflected in paragraphs 2, 3, and 4, reflects out-of-court statements made by Davis himself that were personally heard by Heather. Consequently, Heather's testimony concerning Davis's out-of-court statements was admissible as admissions by a party opponent. *See* TEX. R. EVID. 801(e)(2)(A); *Trevino*, 991 S.W.2d at 853 (noting that "[a] party's own statements are not hearsay and they are admissible on the logic that a party is estopped from challenging the fundamental reliability or trustworthiness of his own statements"). Accordingly, the trial court did not abuse its discretion by overruling Davis's hearsay objections to Heather's testimony reflected in paragraphs 2, 3, and 4, above.

Concerning Davis's Confrontation Clause objections to Heather's testimony as set forth in paragraphs 2, 3, and 4, above, we have not located and Davis has not cited any authority for the proposition that the admission of a defendant's out-of-court statement through a witness who personally heard the statement somehow violates the defendant's right to confront and cross-examine himself about the out-of-court statement he made. Accordingly, the trial court did not err by overruling Davis's Confrontation Clause objections to Heather's testimony reflected in paragraphs 2, 3, and 4.

Concerning Davis's hearsay objections to Heather's testimony as set forth in paragraph 1, assuming the trial court abused its discretion by admitting

47

Heather's testimony about Latarsha's comments to Davis, we proceed to a harm analysis. Because error in admitting a statement in violation of the hearsay rules of evidence is non-constitutional, we apply rule 44.2(b). TEX. R. APP. P. 44.2(b); *West v. State*, 121 S.W.3d 95, 104 (Tex. App.—Fort Worth 2003, pet. ref'd) (applying a rule 44.2(b) harm analysis after determining that the trial court impermissibly allowed a hearsay statement). The reviewing court must deem the error harmless if, after reviewing the entire record, the court is reasonably assured the error did not influence the jury's verdict or had but a slight effect. Thus, we disregard the error if it did not affect appellant's substantial rights. TEX. R. APP. P. 44.2(b); *see Mosley v. State,* 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g), *cert. denied*, 526 U.S. 1070 (1999); *Coggeshall v. State*, 961 S.W.2d 639, 642–43 (Tex. App.—Fort Worth 1998, pet. ref'd). In making this determination, we review the record as a whole. *See Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). As the Texas Court of Criminal Appeals has held, properly admitted evidence of an appellant's guilt is one factor to consider in performing a harm analysis under rule 44.2(b). *Motilla v. State*, 78 S.W.3d 352, 358 (Tex. Crim. App. 2002). Reviewing the record as a whole, including the evidence of Davis's guilt as already set forth in detail herein, any trial court error in permitting Heather to testify that Davis called Latarsha and that she heard Latarsha saying, "I can't

48

talk to you when you're like this" did not influence the jury's verdict. Accordingly, even if the trial court abused its discretion by overruling Davis's hearsay objection to Heather's testimony reflected in paragraph 1, any error was harmless.

Finally, concerning Davis's Confrontation Clause objections to Heather's testimony set forth in paragraph 1, the Sixth Amendment bars the admission *testimonial* statements of a witness who did not testify at trial and was not subject to cross-examination by the defendant. *Crawford*, 541 U.S. at 53–54, 124 S. Ct. at 1365 (emphasis added). Casual remarks made to friends are generally not testimonial. *See id.* at 51, 124 S. Ct. at 1365 (saying that "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not"); *Davis v. State*, 169 S.W.3d 660, 667 (Tex. App.—Austin 2005, pet. ref'd).

In this case, Latarsha's statements that Heather overheard were in the context of a cell phone conversation Latarsha was conducting in the presence of a friend. There is no indication whatsoever that Latarsha made her comments to Davis (that were overheard by Heather) under circumstances that would have led an objective witness to believe that they would be available for use at a later trial. *See Crawford*, 541 U.S. at 52, 124 S. Ct. at 1364.

49

Heather's testimony concerning Latarsha's statements therefore did not violate Davis's Confrontation Clause rights. Accordingly, the trial court did not err by overruling Davis's Confrontation Clause objections to Heather's testimony reflected in paragraph 1.

We overrule Davis's eighteenth point.

## IX. JURY ARGUMENT

## A. Jury Unanimity Argument

In points number five, six, and seven, Davis contends that the trial court erred by sustaining the State's objections to Davis's jury unanimity arguments and, likewise, by overruling Davis's objections to the State's jury unanimity argument. The trial court charged the jury that

> If you believe from the evidence beyond a reasonable doubt that on or about the 28th day of January 2006, in Tarrant County, Texas, the defendant, JAMES ANTHONY DAVIS, did then and there intentionally or knowingly cause the death of an individual, Latarsha Hampton, by cutting or stabbing her with a knife; or

> If you believe from the evidence beyond a reasonable doubt that on or about the 28th day of January 2006, in Tarrant County, Texas, the defendant, JAMES ANTHONY DAVIS, did then and there intentionally, with the intent to cause serious bodily injury to Latarsha Hampton, commit an act clearly dangerous to human life, namely, cutting or stabbing Latarsha Hampton with a deadly weapon, to wit: a knife, that in the manner of its use or intended use was capable of causing death or serious bodily injury, which caused the death of Latarsha Hampton, then you will find the defendant guilty of the offense of murder as charged in the indictment.

50

And the record reflects the following colloquy during closing arguments:

> [DAVIS'S ATTORNEY]: The prosecutor mentioned to you there's two ways that the State is going to seek to establish murder. One is intentionally causing -- intentional and knowing [sic] causing death [sic] of another person . . . The other, . . . is you do something intentionally that's clearly dangerous to human life and as a result of that, a person dies . . . But let me tell you something, all 12 of you have got to figure out which one of those versions is murder. It's not six of you go one way and six of you go another.

> [STATE'S ATTORNEY]: Your Honor, I'm going to have to object to that as a misstatement of the law.

> THE COURT: Sustained.

> [DAVIS'S ATTORNEY]: That is the law, Your Honor.

> THE COURT: I sustained the objection. Go ahead.

> [DAVIS'S ATTORNEY]: All 12 of you have got to agree on the one method by which the murder occurred.

> [STATE'S ATTORNEY]: I'm going to have to object, Your Honor, that's a misstatement of the law.

> THE COURT: Sustained.

Davis further contends that the trial court erred by overruling his objection during the State's closing argument:

> [STATE'S ATTORNEY]: And if six of you say, well, I believe it was an intentional killing and six of you said that it's an act clearly dangerous to human life, you can find him guilty of murder.

> [DAVIS'S ATTORNEY]: Your Honor, we object, Your Honor, we object, that's a violation of requiring unanimity of a verdict.

51

THE COURT: You're overruled.

Jury unanimity is required in all criminal cases. *Ngo v. State*, 175 S.W.3d 738, 745 (Tex. Crim. App. 2005). "Unanimity in this context means that each and every juror agrees that the defendant committed the same, single, specific criminal act." *Id.* Jury unanimity is not violated, however, when the jury disagrees on alternate theories of the defendant's *mens rea* at the time of the offense. *Martinez v. State*, 129 S.W.3d 101, 103 (Tex. Crim. App. 2004); *De Los Santos v. State*, 219 S.W.3d 71, 76 (Tex. App.—San Antonio 2006, no pet.).

The Supreme Court explained this principle in *Schad v. Arizona*, 501 U.S. 624, 111 S. Ct. 2491 (1991). There, the Court said that where the *actus reus* was "murder," all twelve jurors had to agree that the defendant had committed the murder. *Id.* at 630, 111 S. Ct. at 2496. The jury did not need to be unanimous on the issue of whether the defendant murdered with premeditation or in the course of committing a robbery, as such a distinction merely went to *how* the defendant committed the murder, not *whether* he committed the murder. *Id.* at 631–32, 111 S. Ct. at 2497. The Court said,

> We have never suggested that in returning general verdicts in such cases the jurors should be required to agree upon a single means of commission . . . In these cases, as in litigation generally, "different jurors may be persuaded by different pieces of evidence, even when they agree upon the bottom line. Plainly, there is no

52

general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict."

*Id.* (quoting *McKoy v. North Carolina*, 494 U.S. 433, 449, 110 S.Ct. 1227, 1236–37 (1990) (Blackmun, J., concurring)); *see Ngo*, 175 S.W.3d at 746.

Our analysis, then, must begin with an examination of the statute under which Davis was indicted in order to determine the elements of the crime he was charged with and whether the legislature has created a single offense with multiple *mens rea* possibilities or separate offenses that vary according to the offending party's mental state. *See Jefferson v. State*, 189 S.W.3d 305, 311 (Tex. Crim. App. 2006) (quoting *State v. Johnson*, 627 N.W.2d 455, 459–60 (Wis. 2001), *cert. denied*, 534 U.S. 1043 (2001)).

Section 19.02 of the Texas Penal Code, titled "Murder," states that

[a] person commits an offense if he:

(1) intentionally or knowingly causes the death of an individual; [or]

(2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual.

TEX. PENAL CODE ANN. § 19.02(b)(1)-(2) (Vernon 2003). In this statute, the legislature has set forth two different mental states—(1) intentionally or knowingly causing death or (2) committing an act clearly dangerous to human life with the intent to cause serious bodily injury—that would satisfy the intent element of murder. *See White v. State*, 208 S.W.3d 467, 467–68 (Tex. Crim.

App. 2006); *Gray v. State*, 980 S.W.2d 772, 774–75 (Tex. App.—Fort Worth 1998, no pet.). Where the legislature has specified that any of several different mental states will satisfy the intent or *mens rea* element of a particular crime, unanimity is not required on the specific alternate mental state as long as the jury unanimously agrees that the State has proved the intent element beyond a reasonable doubt. *Jefferson*, 189 S.W.3d at 311 (quoting *Johnson*, 627 N.W.2d at 459–60). That is, the jury did not need to unanimously agree on the preliminary factual issue of Davis's mental state when he stabbed Latarsha, as long as it agreed on the bottom line—he murdered her. *See id.*; *Aguirre*, 732 S.W.2d 320, 326 (Tex. Crim. App. 1987); *Gray*, 980 S.W.2d at 774–75.

The jury here was authorized in the charge of the court to find Davis guilty of murder if he "intentionally or knowingly cause[d] the death of an individual or intentionally, with intent to cause serious bodily injury, commit[ted] an act clearly dangerous to human life and cause[d] the death of an individual"; the jury returned a general verdict finding Davis "guilty of the offense of murder as charged in the indictment." The jury unanimity requirement is not violated where, as here, the defendant was indicted under a statute providing alternate means of committing the same offense. *See Schad*, 501 U.S. at 631–32, 111 S. Ct. at 2497; *Jefferson*, 189 S.W.3d at 311; *Gray*, 980 S.W.2d at 774–75.

Davis relies solely on *Ngo* to support his claim on appeal. Such reliance

is misplaced, however, as the indictment and underlying statute involved in *Ngo* are distinguishable from those involved in this case. The State in *Ngo* indicted the defendant for credit card abuse by any one of three *separate* acts as statutorily enumerated. 175 S.W.3d at 742. Specifically, the statute under which the defendant was indicted alleged three different criminal acts: stealing a credit card, receiving a stolen credit card, or presenting a credit card without the cardholder's consent and with the intent to fraudulently obtain a benefit from the credit card's use. *Id.* at 744. In this case, however, Davis was indicted for a single act: the murder of Latarsha Hampton. *Ngo* is therefore distinguishable. Thus, the trial court did not err by sustaining the State's objections or by overruling Davis's objection. Accordingly, we overrule Davis's fifth, sixth, and seventh points.

### B. Attacking Davis Over Counsel's Shoulders

In his ninth point, Davis contends that the trial court erred by overruling his objection to a comment made by the prosecutor during closing statements that attacked Davis over the shoulder of his attorney.

Striking at a defendant over defense counsel's shoulders is impermissible, as it falls outside the generally permissible areas jury argument. *Wilson v. State*, 938 S.W.2d 57, 62 (Tex. Crim. App. 1996), *abrogated on other grounds Motilla v. State*, 78 S.W.3d 352 (Tex. Crim. App.2002). It is difficult to

55

articulate a precise rule to determine when a prosecutor is striking over the defense counsel's shoulder and when he is making a proper jury argument. *Phillips v. State*, 130 S.W.3d 343, 356 (Tex. App.—Houston [14th Dist.] 2004, pet ref'd) (op. on reh'g); *Tyler*, 2006 WL 1452536, at*2.  However, a prosecutor risks improperly striking at a defendant over the shoulder of counsel when the argument refers to defense counsel personally and when the argument explicitly impugns defense counsel's character. *Mosley*, 983 S.W.2d at 259; *Guy v. State*, 160 S.W.3d 606, 617 (Tex. App.—Fort Worth 2005, pet. ref'd); *Tyler*, 2006 WL 1452536, at *2.  The court of criminal appeals has held that the "over-the-shoulder" rule is designed to protect the defendant from improper prosecutorial character attacks directed at defense counsel. *Coble v. State*, 871 S.W.2d 192, 205 (Tex. Crim. App. 1993), *cert. denied*, 513 U.S. 829 (1994).

In this case, the trial court denied Davis's request to include in the jury charge an instruction on self-defense.  Despite the trial court's denial, during closing arguments Davis argued that he had acted in self-defense in an effort to negate the intent element of the offense:  "Both people got knifed.  Both people are fighting and both people are going for the neck where the carotid artery is, where the jugular vein is, and where someone is going to die if that's cut."  During its rebuttal to Davis's closing argument, the State said, "Ladies

56

and gentlemen, if you look at this case and you look at all the facts surrounding this case, there's no evidence to suggest that Latarsha Hampton was armed. Those are machinations drawn up by the defense attorney." At that point, Davis's attorney objected that such a statement attacked Davis over the shoulders of defense counsel, violated his due process rights, and deprived him of his right to a fair trial. The trial court overruled Davis's objection, and the prosecutor continued, "There's no evidence to suggest that."

Viewing the prosecutor's statement in the context of the entire argument, the comment was made in rebuttal, specifically in response to Davis's claim that Latarsha was armed and had attacked Davis. *See Mosley*, 983 S.W.2d at 256; *York v. State*, No. PD-1753-06, 2008 WL 2677368, at *5 (Tex. Crim. App. July 2, 2008) (not designated for publication). By saying that the idea that Latarsha was armed was a "machination[] [of] the defense attorney" and continuing by emphasizing that there was no evidence presented to support such a claim, the prosecutor was properly answering an argument of opposing counsel. *See Felder*, 848 S.W.2d at 94–95.

Case law supports this conclusion. For example, in *Coble* the prosecutor argued that the defense attorney's lawyer was arguing "something ridiculous." 871 S.W.2d at 205. The court of criminal appeals noted that such a statement was not directed at defense counsel, but at defense counsel's argument. *Id.*

57

This stands in stark contrast to the cases cited by Davis and other cases in which the appellate court has determined that a prosecutor's comment did strike at the defendant over defense counsel's shoulders. *See Gomez v. State*, 704 S.W.2d 770, 772 (Tex. Crim. App. 1985) (holding prosecutor's argument that defense counsel was manufacturing evidence and thus suborning perjury was improper); *Lopez v. State*, 500 S.W.2d 844, 846 (Tex. Crim. App. 1973) (holding prosecutor's statement that defendant and defense counsel were lying when they pleaded not guilty was improper); *Guy*, 160 S.W.3d at 616–17 (holding prosecutor's statement that defense attorneys knew that a defendant accused of cocaine possession lived in a "crack house" was improper); *Lopez v. State*, 705 S.W.2d 296, 298 (Tex. App.—San Antonio 1986, no pet.) (holding prosecutor's argument that defense counsel's goal was to keep evidence from the jury was improper).

Accordingly, we overrule Davis's ninth point.

### C. State's Argument Outside the Record

In his eighth point, Davis contends that the trial court erred by denying his motion for mistrial made in response to an allegedly improper jury argument by the State. Specifically, during its rebuttal in closing arguments, the State argued,

58

> [I]f you remember when Officer Hatton was on the stand and testifying, he told you he talked to -- he talked to Tanoah and he told you Tanoah told him that night after my dad cut my momma, he then cut himself. She saw him cut the wrists. So if he's cutting his wrists, doesn't it make sense that, yes, he's cutting his neck.

At this point, Davis objected that the prosecutor's argument was outside the record. The trial court sustained Davis's objection and instructed the jury to "disregard the last statement." The trial court denied Davis's subsequent motion for a mistrial. After the trial court overruled Davis's motion for a mistrial, the prosecutor briefly remarked, "I implore you to remember the testimony of Officer Hatton," before continuing with a summation of the testimony from other witnesses about Latarsha and Davis's troubled relationship (a topic unrelated to who cut Davis's neck).

The purpose of closing argument is to assimilate the evidence to assist the fact-finder in drawing proper conclusions from the evidence. *Gaddis v. State*, 753 S.W.2d 396, 400 (Tex. Crim. App. 1988). The jury is then free to accept or reject such conclusions and inferences. *Id*. Counsel is afforded virtually unlimited latitude in this regard as long as the argument is supported by the evidence and made in good faith. *Porter v. State*, 832 S.W.2d 383, 386 (Tex. App.—Houston [1st Dist.] 1992, no pet.).

59

The record here reflects that, in fact, after a series of questions by the prosecutor Officer Hatton was asked, "Okay.  So Tanoah indicated that her daddy had cut her mom's neck and that her daddy had cut his own wrist?" And Officer Hatton responded, "That's correct."  Detective Graham also opined that Davis's neck wound was self-inflicted.  Thus, the State's argument quoted above was a reasonable deduction from the evidence and did not interject any new or harmful facts into the record.  *Accord Arnold v. State*, 234 S.W.3d 664, 674 (Tex. App.—Houston [14 Dist.] 2007, no pet.) (holding State's argument was proper deduction from evidence); *DeLarue v. State*, 102 S.W.3d 388, 406 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd) (same). Accordingly, because the State's argument was proper, Davis obtained more relief than he was entitled to when the trial court sustained his outside-the-record objection and instructed the jury to disregard the prosecutor's last statement.  *See Reyes v. State*, No. 01-00-00688-CR, 2001 WL 463015, at *4 (Tex. App.—Houston [1st Dist.] May 3, 2001, no pet.) (not designated for publication).  The trial court consequently did not abuse its discretion by denying Davis's motion for mistrial.  *Id*.  We therefore overrule Davis's eighth point.

## X.  EVIDENCE DURING THE PUNISHMENT PHASE

In his twelfth point, Davis contends that the trial court erred by admitting a prior conviction because the State purportedly failed to link the prior conviction to Davis. During the punishment phase of trial, the trial court admitted two exhibits offered by the State regarding prior felony offenses that Davis had committed. One exhibit (Exhibit 55) contained a judgment against Davis for theft of a check between $750 and $20,000 in 1994. In addition to the judgment, this exhibit contained a picture of Davis and a set of Davis's fingerprints. A fingerprint examiner testified that he had taken Davis's fingerprints approximately fifteen minutes before testifying and that he had matched the fingerprints from the pen packet in Exhibit 55 to Davis. Davis does not contest the court's admission of Exhibit 55 into evidence.

The second exhibit admitted into evidence (Exhibit 56) contained a judgment against a "James Anthony Davis" for felon in possession of a firearm in 1997. This exhibit contained only a judgment, a waiver form, and an Information. It did not contain any descriptive or other identifying information about the "James Anthony Davis" referred to in the judgment. However, the Information in Exhibit 56 specifically referenced the 1994 theft of a check case from Exhibit 55 by setting forth that case's cause number. Davis objected when the State offered Exhibit 56 as evidence, saying that the State had failed to establish that the Davis from that judgment was the same Davis on trial.

61

Davis urged that the State could not link him to the prior conviction because there was no identifying information in Exhibit 56. In response to the State's argument, Davis argued at trial and in his brief to this court that the Information in Exhibit 56 (which set forth the cause number from the uncontested prior conviction evidenced by Exhibit 55) could not be used as evidence to establish that he was the same person who committed both crimes. The trial court overruled Davis's objection.

Under the penal code, if, during the punishment phase of trial, the State proves that the defendant has previously been finally convicted of two felony offenses, then the defendant's minimum punishment is enhanced to twenty-five years' confinement. TEX. PENAL CODE ANN. § 12.42(d) (Vernon Supp. 2008). To establish that a defendant was convicted of an enhancement offense, the State must (1) prove the existence of the conviction and (2) link the conviction to the defendant. *Martin v. State*, 227 S.W.3d 335, 337 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (citing *Beck v. State*, 719 S.W.2d 205, 209–10 (Tex. Crim. App. 1986)).[7] The State may establish a defendant's previous conviction through certified copies of a judgment and sentence (a pen packet). *Beck*, 719

---

[7] Davis does not attack the sufficiency of the evidence to prove the existence of a prior conviction. Therefore, we discuss only the second of these two requirements.

S.W.2d at 209. However, the State must provide independent evidence linking these documents to the defendant on trial. *Id.* at 210. Therefore, a pen packet is inadmissible unless it is joined with independent evidence that the person convicted of the offense charged in the pen packet is the same person before the court. *Id.*; *Zimmer v. State*, 989 S.W.2d 48, 51 (Tex. App.—San Antonio 1998, pet. ref'd).

Whether the State meets its burden of linking the conviction to the defendant is a matter of conditional relevancy. *Smith v. State*, 998 S.W.2d 683, 687 (Tex. App.—Corpus Christi 1999, pet. ref'd); *Wright v. State*, 932 S.W.2d 572, 576 (Tex. App.—Tyler 1995, no pet.); *Rosales v. State*, 867 S.W.2d 70, 72 (Tex. App.—El Paso 1993, no pet.). That is, the relevance of a prior conviction is conditioned upon the production of evidence sufficient to show that the defendants are one and the same. *Beck*, 719 S.W.2d at 210–11; *Smith*, 998 S.W.2d at 687; *Rosales*, 867 S.W.2d at 72.

This is not to say, however, that the State must provide such linking evidence before a trial court can properly admit the pen packet; evidence should not be excluded merely because its relevance may depend upon the production of additional evidence at a later point in the trial. *Fuller v. State*, 829 S.W.2d 191, 197 (Tex. Crim. App. 1992), *overruled on other grounds by Castillo v. State*, 913 S.W.2d 529, 537 (Tex. Crim. App. 1995); *Yeager v. State*, 737

S.W.2d 948, 951 (Tex. App.—Fort Worth 1987, no pet.). Therefore, when authenticated copies of conviction records are offered into evidence to prove that a prior conviction is part of a defendant's prior criminal record, it is not essential that supporting identification evidence precede the admission of the conviction evidence. *Beck*, 719 S.W.2d at 210. If, after all proof on the fact in question has been received, and the evidence does not, in the aggregate, support a rational finding that the defendant is the same person as the one previously convicted, then the fact-finder should not be allowed to consider the evidence of the conviction. *Smith*, 998 S.W.2d at 688; *see Fuller*, 829 S.W.2d at 197; *Beck*, 719 S.W.2d at 210–11. In the case of evidentiary facts, it means that a motion to strike should be granted to withdraw the evidence from consideration. *Fuller*, 829 S.W.2d at 197; *Smith*, 998 S.W.2d at 688.

The court of criminal appeals has recognized several ways to link a defendant to prior convictions. *See Beck*, 719 S.W.2d at 209–10. One of the methods that the court of criminal appeals has recognized is via the "testimony of a witness who personally knows the defendant and the fact of his prior conviction and identifies him." *Id.* at 209 (*citing Ward v. State*, 505 S.W.2d 832 (Tex. Crim. App. 1974)). Therefore, if the State offers conviction records into evidence and establishes through the testimony of someone with personal knowledge that the defendant on trial is the same person who was previously

64

convicted, the trial court does not err by allowing the jury to consider the conviction for enhancing the defendant's punishment. *Id.*

In this case, Davis objected to State's Exhibit 56 at the time of its admission because there was no identifying information contained in the exhibit to link Davis to the prior conviction. At trial and on appeal, Davis contends that the only connection between Davis and the exhibit was an attached Information that referenced the cause number in a case that was linked to Davis in Exhibit 55. Davis urges that the Information cannot be used as evidence linking him to a prior conviction. The State, however, offered other independent evidence linking Davis to the felon in possession of a firearm conviction through the testimony of Davis's ex-wife, Jacqueline Anderson.

Jacqueline testified that she had personally known Davis since 1989, was married to him for the first time in 2000, and was married to him again in 2002. Jacqueline testified that she was familiar with Davis's criminal history and knew about both the theft of a check conviction and the felon in possession of a firearm conviction. Specifically, Jacqueline testified, without objection, as follows:

Q:   Jacqueline, are you familiar with the -- with James' criminal history?

A.   Yes.

Q. Are you aware of a theft or [sic] a check case that he was convicted for in 1990?

A. Yes.

Q. And actually went to the penitentiary for it in 1994?

A. Yes.

Q. Is this the same James Davis who was convicted in that case?

A. Yes.

Q. Are you familiar with an unlawful possession of a firearm by a felon case that he went to the penitentiary for?

A. Yes.

Q. In 1997?

A. Yes.

Q. And is this the same James Davis that was convicted in that offense?

A. Yes.

Through this testimony of Davis's ex-wife, who had known Davis since 1989 (well before the 1994 at 1997 convictions), had married him twice, and demonstrated personal knowledge of Davis's criminal history, the State established that Davis was the same person previously convicted for felon in possession of a firearm in 1997. *See Beck*, 719 S.W.2d at 209. Linking Davis to a prior conviction made that prior conviction relevant to the jury's

determination of appropriate punishment for Davis.  *See* TEX. PENAL CODE ANN.

§ 12.42(d); *Smith*, 998 S.W.2d at 687; *Wright*, 932 S.W.2d at 576; *Rosales*,

867 S.W.2d at 72.  Therefore, the trial court did not err by admitting Exhibit

56, and we overrule Davis's twelfth point.

## XI.  CONCLUSION

Having overruled all of Davis's points, we affirm the trial court's

judgment.

SUE WALKER
JUSTICE

PANEL:  LIVINGSTON, WALKER, and MCCOY, JJ.

PUBLISH

DELIVERED: August 26, 2008