

# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

## NO. 02-09-00020-CR

PAUL KRAJCOVIC                                                                          APPELLANT

V.

THE STATE OF TEXAS                                                                          STATE

----------

## FROM THE 16TH DISTRICT COURT OF DENTON COUNTY

----------

## OPINION ON APPELLANT'S MOTION FOR
## EN BANC RECONSIDERATION

----------

A jury convicted Appellant Paul Krajcovic of murder and assessed his punishment at fifty-five years' confinement. The trial court sentenced him accordingly. Appellant brings a single point on appeal, arguing that the trial court reversibly erred by submitting to the jury "a charge that improperly limited it to finding that an offense occurred prior to September 1, 2007 (the effective date of the Castle Doctrine)." Appellant argues that the date of the offense was a fact issue to be determined by the jury in order for the jury to further determine

whether he had a duty to retreat. On original submission, we held that the trial court did not err by instructing the jury and affirmed the trial court's judgment. Appellant subsequently filed a motion for en banc reconsideration. This court denies Appellant's motion in a separate order today, but on our own motion, we withdraw our original opinion and judgment of July 29, 2010, and substitute the following.

**Statement of Facts**

Appellant and Jerrod DeShun (a/k/a Shawn) Scales used and sold drugs together. Darin Robinson, their friend and fellow drug user, testified that he and Shawn did drugs and watched movies at about 9:00 or 10:00 p.m. in late August 2007, on approximately August 25 or 26 (a Saturday or Sunday) at Darin's house. Darin stated that sometime later, Appellant called Shawn, and Shawn walked to Appellant's house. Darin testified that he walked to Appellant's house to get a cigarette at around 1:00 or 2:00 a.m. Darin stated that while he was at Appellant's house, both Appellant and Shawn were in a good mood, there were no arguments between them, all three were using drugs, and both Appellant and Shawn asked him to leave because they expected some girls to come to Appellant's house.

Wayne Shoffner, a friend, fellow drug user, and Darin's houseguest, testified,

> Q.    Now, specifically talking about the last time you saw Shawn, do you remember about what day that was?

2

A. I knew it was on a Monday. I couldn't tell you what the date was, but it was on a Monday.

Q. Was that in late August?

A. It might have been, yeah.

Q. Do you remember if—

A. It might have been in late August or early October. I'm not for sure. It was between one of those two.

Q. Late August, early—

A. —October.

Q. October? What about September?

A. It could have been there. I don't know. It's been a while.

But Wayne's testimony also showed that he went to Appellant's house on the same day that Shawn went to Appellant's house to meet some girls and on the same day that Darin walked down to Appellant's house to get a cigarette. (We note that that Monday would have been August 27, 2007, if we rely on the testimony of other witnesses.) Shawn left his car at Darin's house that day. By the next morning, the car was gone.

Officer John Lambert, a narcotics officer with the City of The Colony, knew Shawn, Darrin, and Wayne as drug users and drug dealers. Lambert regularly checked Appellant's house and trash between July and September 2007. The last time that Lambert saw Shawn at Appellant's house was on August 28, 2007, when he saw them both enter the house at around 5:30 p.m. Lambert learned that Shawn was missing on September 5, 2007.

3

Shawn failed to report for work on August 29, and, although he usually called his mother when he returned home late, he failed to do so after August 27, 2007.

The Friday or Saturday after Shawn last contacted his mother (August 31 or September 1), Appellant called Darin and invited him to try some cocaine at Appellant's house. Darin stated that he walked into the kitchen or living room through the open garage at the back of Appellant's house, which he testified was the method of entry Appellant preferred his guests to use, did a line of cocaine, and then left. There was no mention of Shawn.

Sometime during that weekend or early during the following week, Shawn's father became worried and began searching for Shawn. On September 5 or 6, 2007, a mutual female friend of Darin's and Appellant's called Darin to tell him that something had happened to Shawn. Appellant did not answer when Darin tried to reach him immediately after receiving the phone call. A couple of days later, Darin and others met at Appellant's house and banged on all the doors. "[N]obody was there."

On September 6, 2007, Paul Krajcovic, Jr., Appellant's father, and Paula Power, Appellant's sister, went to The Colony Police Department and spoke with Officer Andrew Longo about a possible injured or dead body at Appellant's home. Power told Detective Miles Outon that Appellant had told her that he had shot and killed a black person in his house and had put the body in the bathroom.

Power had also told her father about a conversation with Appellant. Appellant was living in his parents' house and had come to Power's house the night of September 5, 2007, dropped his son D.K. off, and borrowed their mother's car; their mother gave him some money. Later that night, Appellant returned to Power's house, frightened. He was talking to Power and their mother in the garage when he said he heard something, cocked his gun, and told them to go inside the house. When Power and her mother came back out to the garage, Appellant told them that a dead man was in their mother's bathroom with a bullet in his head and that some people were after him. Appellant told Power that he had shot a black man and put his body in the bathroom. Appellant told her that he had had to kill the man because "it was either [Appellant] or him." There was a suggestion that Appellant had told Power that the man was still alive after Appellant had shot him, so Appellant had then strangled the man, but Power testified that she did not remember that statement.

D.K. testified about the last night that he spent with his father. They were living in Appellant's mother's house in The Colony. D.K. was unclear on the exact date but testified that he remembered talking to a counselor during the week before trial and that she had asked him what had happened in September 2007, and he told her about his last night with his father. On the last night that he was with his father, D.K. had not started school. He testified that school started in late August, right before he "got a holiday." But he was not going to school

5

because his father had not registered him. Appellant had told D.K. to lie to his mother and say that he was going to school.

D.K. testified that on their last night together, he and Appellant were in bed watching TV when they heard glass break. Appellant told D.K. to stay there under the covers, and Appellant left the room. D.K. heard a gunshot and then his father returned; D.K. thought Appellant came from the hallway. D.K. testified that Appellant looked scared as he came through the doorway because he'd just had to stop somebody who had broken into the house. Appellant immediately took D.K. to his aunt's house where Appellant's mother was visiting. D.K. testified that his father seemed frightened.

A long time before the gunshot, D.K. heard "a bunch of people banging on the windows and doors and stuff." He also testified that people started banging on the walls and doors "like before all of it happened. Like before, probably a few weeks before that happened. . . . And they just kept doing it."

Appellant's father, a former reserve police officer, told the police that his son was involved with something "worse than the Mafia."

On September 6, 2007, the same day that Appellant's father and sister went to the police, Officer Longo and two other officers located Shawn's body in the master bathroom in Appellant's home.

Appellant gave a written statement to the police on September 7, 2007. He stated that he, Darin, Shawn, and D.K. were at his house. Darin left. Soon after Darin left, Shawn began asking Appellant about $200 that Appellant owed

6

him for drugs, and Appellant told him that he did not think that he had it. Appellant stated that Shawn "had been bugging" him about it for a few days and had made "t[h]reats to kill [Appellant] and [his] family if [Appellant] didn't get it to him." But this time, Shawn told Appellant that if he didn't repay the $200 "right now[,]" then Shawn was going to kill him, and Shawn told Appellant that he had someone already waiting in Appellant's house to kill D.K. and that Shawn was going to kill Appellant. Appellant stated that Shawn "always bragged about the people he already had killed over money." Appellant stated that he told Shawn that he would go look for some money but returned to the room empty-handed, stating that he would get Shawn the money as soon as possible. Shawn

> got very mad and started to grab at [Appellant,] and [Appellant] took
> [his] gun out, to try and get him to leave so him and the person he
> said was in the house to kill [Appellant's] son [D.K.] couldn't hurt
> [them] like he said they [were] going to. When [Shawn] saw that
> [Appellant] had a gun, he grabbed for it and [they] began to struggle
> more and more. During the struggle[,] the gun went off and [Shawn]
> fell back on the bed. [Appellant] ran to [D.K.'s] room to see if he was
> ok and to make sure that no one had hurt or killed [him]. When
> [Appellant] got to the room that [D.K.] was in and saw that he was
> ok, [Appellant] told [D.K.] that the gun went off by accident and told
> him that it was time to go. [Appellant and D.K.] both got in
> [Appellant's] truck and left. [They] went to 7-11 and for a drive to
> figure out what [Appellant] should do. [Appellant] was very scared
> and didn't know what to do. [He] was scared to call the cops,
> because [he] thought that they would think that it was on purpose.
> [Appellant] was going to call [his] mother but, didn't want to involve
> her.

Appellant's written statement describing how Shawn's death occurred did not indicate the date of death.

7

Dr. Gary Sisler, Deputy Medical Examiner for the counties of Denton, Johnson, Parker, and Tarrant, autopsied the body either the evening of September 6 or on September 7. He testified that the body was well past the stage of rigor mortis, which Sisler testified begins to set in twenty to thirty minutes after death and lasts approximately thirty-six hours. The body was "markedly decomposed," and maggots infested the face. Flies were also present on the scene. Dr. Sisler could not say how long Shawn had been dead when his body was discovered, except that it was more than thirty-six hours. But when asked by the prosecutor, "You've learned in your investigation that that body was left in the residence for [ten] days?", Detective Roy Murray answered, "True," with no objection.

On the other hand, Officer Outon, who interviewed Appellant's father and sister and investigated the incident, did not dispute defense counsel's characterization of the shooting as having taken place in September:

> Q: So this offense that you're interviewing happened September 1st, around about there, 2007, and your first interview with [D.K.] is the last part of October 2008, nearly a little over a year later, correct?
>
> A: Yes, sir.
>
> . . . .
>
> Q: As long as we're talking about the same instance, so everybody is clear.
>
> Now it's been a year since this shooting in September 2007. You interviewed [D.K.] last part of October 2008, a couple of weeks before trial.

8

The story he tells you kind of surprises you, when he's only a suspect—or an interested witness, correct?

A: He's not a suspect.

. . . .

Q. What he told you kind of surprised you, correct?

A. Because it didn't match up with the evidence.

. . . .

Q: . . . . There had been an interview with [D.K.] with one of the investigating officers within a week of this September 2007 shooting of Shawn Scales, correct?

A: I—I don't know.

Police officers who examined the crime scene believed that Shawn was killed while he was urinating in the bathroom because his pants were pulled down, his penis was exposed, and the toilet seat was up. No evidence indicates that urine was found in the toilet or that any inhabitant of the home would have objected to the toilet seat being up. Further, Darin testified that Shawn "wore his pants commonly hanging off his behind." Darin and their other friends would tell Shawn to pull up his pants because he was getting older.

The police officers all agreed that the house was a mess and that they had to kick away things strewn on the floor in order to walk. They also found an open safe in the room next to the bathroom. They also all agreed that the people involved in the homicide were involved in the drug business, which is a cash business. Nevertheless, they all concluded that there was no evidence of forced entry or that anything or anyone had been dragged into the bathroom and that

9

Shawn must have been shot while he was in the bathroom. Although some of the police officers saw a broken window that had been boarded over, they believed that the boards had been there a long time and described them as dirty with scratch marks made by dogs.

Dr. Sisler determined that a small caliber bullet found in Shawn's brain had caused the death. He found no gunshot residue, so the gunshot was not a contact wound and was, in fact, the result of a gun fired from more than a foot away. Dr. Sisler testified that he would expect some bleeding but little or no blood splatter and that the gunshot could have caused immediate paralysis without causing immediate death. A person with such an injury could have lived five to fifteen minutes. Although he saw some bruising that could have indicated strangulation, he saw no damage to the larynx. Dr. Sisler could not determine how long Shawn had been dead.

**Analysis**

Appellant argues that the trial court presumed an August 2007 date of death and improperly instructed the jury only on the law as it stood prior to September 1, 2007. Appellate review of error in a jury charge involves a two-step process.[1] Initially, we must determine whether error occurred.

---

[1]*Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994); *see also Sakil v. State*, 287 S.W.3d 23, 25–26 (Tex. Crim. App. 2009).

A defendant is entitled to an instruction on every defensive issue raised by the evidence regardless of the strength of the evidence.[2]  A defendant need not testify in order to raise a defense.[3]  Defensive issues may be raised by the testimony of any witness, even those called by the State.[4]  It is not the court's function to determine the credibility or weight to be given the evidence raising the issue.[5]  The fact that the evidence raising the issue may conflict with or contradict other evidence in the case is not relevant to the determination of whether a charge on the issue must be given.[6]  This rule is designed to insure that the jury, not the judge, will decide the relative credibility of the evidence.[7]  The Texas Court of Criminal Appeals instructs us that "[w]hen a judge refuses to give an instruction on a defensive issue because the evidence supporting it is weak or

---

[2]*Brown v. State,* 955 S.W.2d 276, 279 (Tex. Crim. App. 1997).

[3]*Boget v. State*, 40 S.W.3d 624, 626 (Tex. App.—San Antonio 2001), *aff'd*, 74 S.W.3d 23, 26 (Tex. Crim. App. 2002).

[4]*Jackson v. State*, 110 S.W.3d 626, 631 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd).

[5]*Gibson v. State*, 726 S.W.2d 129, 133 (Tex. Crim. App. 1987).

[6]*Id.*

[7]*Miller v. State*, 815 S.W.2d 582, 585 (Tex. Crim. App. 1991); *Woodfox v. State*, 742 S.W.2d 408, 409–10 (Tex. Crim. App. 1987).

unbelievable, he effectively substitutes his judgment on the weight of the evidence for that of the jury."[8]

For offenses committed before September 1, 2007, deadly force could only be justified "if a reasonable person in the actor's situation would not have retreated."[9] But the doctrine known as the "castle doctrine" became effective September 1, 2007.[10] It relieves a person of the duty of retreating when he is justified in using deadly force against another in self-defense or defense of a third person and he has a right to be present at the location where the deadly force is used, has not provoked the person against whom the deadly force is used, and is not engaged in criminal activity at the time the deadly force is used.[11] Trial counsel timely objected to the trial court's omission of the "castle doctrine" instruction.

Entitlement to a self-defense instruction, in general, is predicated on the provision of some evidence that the defendant was authorized to use force

---

[8]*Granger v. State*, 3 S.W.3d 36, 38 (Tex. Crim. App. 1999) (citing *Miller*, 815 S.W.2d at 585 and *Woodfox*, 742 S.W.2d at 410).

[9]Act of May 27, 1995, 74th Leg., R.S., ch. 235, § 1, sec. 9.32, 1995 Tex. Gen. Laws 2141, 2141 (amended 2007) (current version at Tex. Penal Code Ann. §§ 9.31, 9.32 (West 2011)); *Davis v. State*, 268 S.W.3d 683, 697 n.3 (Tex. App.—Fort Worth 2008, pet. ref'd).

[10]*See* Act of March 27, 2007, 80th Leg., R.S., ch. 1, § 5, 2007 Tex. Gen. Laws 1, 2 (codified as amendment to Tex. Penal Code Ann. §§ 9.31, 9.32 (stating that offense committed before the act's effective date is governed by the sections in effect when offense was committed); *Davis*, 268 S.W.3d at 697 n.3.

[11]*See* Tex. Penal Code Ann. §§ 9.31–.33 (West 2011).

against another.[12]  No party questions Appellant's entitlement to a self-defense instruction.  In fact, as the State notes in its brief, "During the charge conference, the State volunteered and later conceded that an instruction on self-defense should be submitted."  But the trial court's obligation to instruct the jury on the version of the self-defense law in effect beginning September 1, 2007, is dependent upon whether any evidence from any source supports a conclusion that the assault and death occurred on or after September 1, 2007.[13]

Appellant relies on Wayne's testimony that it could have been September when he saw Shawn alive at Appellant's house to support his contention that he was entitled to a charge on self-defense law effective September 1, 2007.  We note that D.K.'s testimony combined with his aunt's testimony also provides some support that the killing could have occurred in September as opposed to August.  It was not clear-cut that Appellant killed Shawn before September 1; it was not clear-cut that Appellant killed Shawn on or after September 1.  There was evidence of both scenarios.  Because there was evidence of both scenarios, Appellant was entitled to the requested self-defense instruction under section 9.31 as amended effective September 1, 2007.  The trial court therefore erred by refusing to give the instruction.

---

[12]See *Ex parte Nailor*, 149 S.W.3d 125, 132 (Tex. Crim. App. 2004).

[13]See *Shaw v. State*, 243 S.W.3d 647, 657 (Tex. Crim. App. 2007), *cert. denied*, 553 U.S. 1059 (2008).

We must therefore evaluate whether sufficient harm resulted from the error to require reversal.[14]  Error in the charge, if timely objected to in the trial court, requires reversal if the error was "calculated to injure the rights of [the] defendant," which means no more than that there must be *some* harm to the accused from the error.[15]  In other words, a properly preserved error will require reversal as long as the error is not harmless.[16]  In making this determination, "the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole."[17]

The indictment employs an "on or about" August 28, 2007 date.  During voir dire the prosecutor told the jury, "This occurred in late August, early September, 2007."  We recognize that the reference is vague and not limited to the death but could also include the investigation.

---

[14]*Abdnor*, 871 S.W.2d at 732.

[15]Tex. Code Crim. Proc. Ann. art. 36.19 (West 2006); *Abdnor*, 871 S.W.2d at 731–32; *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g); *see also Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009) ("A claim of jury-charge error is reviewed using the procedure set out in *Almanza*.").

[16]*Almanza*, 686 S.W.2d at 171.

[17]*Id.*; *see also Ovalle v. State*, 13 S.W.3d 774, 786 (Tex. Crim. App. 2000).

The jury charge instructed the jury to find Appellant guilty of murder if they found beyond a reasonable doubt "that on or about the 28th day of August, 2007" Appellant intentionally caused Shawn's death. There was no instruction on the meaning of "on or about." The jury was further instructed that a person is justified in using deadly force if a reasonable person in the same situation would not have retreated.

The State reinforced the instruction by arguing that the State could not "give" the jury a precise date of the offense, but "the State isn't required to prove that exactly on the 28th day was the exact date that this occurred." The argument continued,

> I mean, think about it: If someone killed someone and hid the body or buried the body, to the point where you heard the doctor, well, I can't give you a precise date. . . . Could you imagine that? If you're going to kill somebody, hide the body, because, then, hey, can't be guilty of murder because you can't do an exact date.

Any attempt by the defense to argue to the jury that the State had to prove Appellant killed Shawn before September 1 would seem to prove the State's position that requiring the State to prove a date certain is a scam to flim-flam the system. That is, the State relied on the law in effect through August 31, 2007 and undercut any possible argument by Appellant that the jury would have to determine whether Shawn was killed before or after September 1 to apply the correct law.

As to the duty to retreat, there is no evidence that Appellant retreated. If the jury could find that the elements of self-defense as of September 1, 2007

15

were satisfied and that the killing occurred on or after that date, requiring the jury to also conclude that a reasonable person would not have retreated would add a requirement for acquittal not mandated by the controlling law. That is, the jury in that situation and without an instruction on current self-defense law could find that all the self-defense requirements effective on or after September 1, 2007, were met and nonetheless convict Appellant because of the absence of evidence that a reasonable person would not have retreated.

We hold that Appellant suffered some harm as a result of the erroneous charge.[18] We therefore sustain Appellant's sole point, reverse the trial court's judgment, and remand this case to the trial court for a new trial.

LEE ANN DAUPHINOT
JUSTICE

PANEL: DAUPHINOT, MCCOY, and MEIER, JJ.

MEIER, J. filed a dissenting opinion.

PUBLISH

DELIVERED: August 31, 2011

---

[18]*See Almanza*, 686 S.W.2d at 171; *Ovalle*, 13 S.W.3d at 786; *Brown,* 955 S.W.2d at 279.



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-09-00020-CR

PAUL KRAJCOVIC                                                              APPELLANT

V.

THE STATE OF TEXAS                                                              STATE

----------

FROM THE 16TH DISTRICT COURT OF DENTON COUNTY

----------

## DISSENT TO OPINION ON APPELLANT'S
## MOTION FOR EN BANC RECONSIDERATION

----------

Appellant Paul Krajcovic was not entitled to a self-defense instruction because there is no evidence that he reasonably believed that deadly force was immediately necessary to protect himself from Shawn. *See* Tex. Penal Code Ann. § 9.31(a) (West 2011) (providing that the use of force against another for self-defense is justified "when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force"); *id.* § 9.32 (West 2011) (providing that the use

of deadly force requires a showing that the use of deadly force is immediately necessary); *Preston v. State*, 756 S.W.2d 22, 25 (Tex. App.—Houston [14th Dist.] 1988, writ ref'd) ("The mere fact that the accused 'believed' the complainant might in some manner attack the accused, without evidence of any overt act or words that would lead the accused to *reasonably* believe he was in danger, is insufficient to give rise to a right to an instruction and charge on self-defense."). D.K.'s response of "Um-hum, um-hum" to the prosecutor's question that Appellant was "probably pretty scared because he's had to stop somebody who broke in the house" is not evidence that Shawn caused Appellant to reasonably believe that deadly force was immediately necessary to defend himself.

Further, Appellant was not entitled to an instruction in accordance with the "castle doctrine" because there is no fact issue that Appellant murdered Shawn at any point other than in August 2007. Darin Robinson stated no less than three times during his testimony that he last saw Shawn in August 2007. Shawn's mother testified that she last spoke to Shawn on August 27, 2007, and that his employer had also called her because Shawn did not report to work. John Lambert testified that August 28, 2007, was the last time that anyone had seen Shawn. The condition of Shawn's body on September 6, 2007—"markedly decomposed" and in the stage of post-rigor mortis—suggests that Appellant murdered Shawn in August 2007. Wayne Shoffner's testimony is not "affirmative evidence" that Appellant murdered Shawn on or after September 1, 2007, *see Madden v. State*, 242 S.W.3d 504, 513 (Tex. Crim. App. 2007), and D.K.'s

2

testimony, by itself or "combined with his aunt's testimony," contains no evidence that the murder occurred in September 2007.

Because the majority holds that the trial court erred in instructing the jury, I respectfully dissent.

BILL MEIER
JUSTICE

PUBLISH

DELIVERED:  August 31, 2011