

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-17-00367-CR

_____

LAVOY WOODS, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from Criminal District Court No. 2
Tarrant County, Texas
Trial Court No. 1462051D

---

Before Sudderth, C.J.; Meier and Kerr, JJ.
Memorandum Opinion by Chief Justice Sudderth

# MEMORANDUM OPINION

In three points, Appellant Lavoy Woods appeals his conviction for aggravated sexual assault of a child under the age of six. *See* Tex. Penal Code Ann. § 22.021 (a)(2)(B), (f)(1) (West Supp. 2018). We affirm.

## Background

### I. Amy's outcry of abuse

Woods is the father of Amy,[1] the complainant in this case. He and Amy's mother, Mariah, married in November 2006, a month after Amy's birth, but separated in late 2012 and divorced in 2013. In 2016, Mariah received a Facebook message from Woods's niece, Kendra, that Woods had sexually abused her when the family was living with Kendra's family in 2008 in Ohio.

Concerned, Mariah asked Amy—who was nine at the time—if anyone had ever touched her inappropriately, to which Amy replied, "No." But according to Mariah, when she then asked Amy if anyone had ever made her do anything inappropriate or uncomfortable, Amy replied, "Yes," and told Mariah that Woods "had made her put her lips on him and then lick him." Mariah testified that Amy said Woods made her "grab him with both hands and stroke him" and that he made her lick his "nina"—a

---

[1]We refer to the complainant and family members by aliases in an attempt to protect their privacy. *See McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

term Amy used to refer to Woods's penis.  Amy told Mariah that it happened in the bedroom Woods and Mariah shared in the Fort Worth home they purchased in 2012.

## II.  The police investigation

Mariah immediately called the police, who began an investigation.

### A.  Forensic interview with Lindsey Dula

In May 2016, Lindsey Dula conducted a forensic interview with Amy, and a redacted video recording of that interview was admitted into evidence at trial.  In the redacted version, Amy described the abuse to Dula:

Dula:  So, talk about what would happen when your mom was at work.

Amy:  Like, I was just watching TV in my room and he said, "[Amy], come here," and then I came there and then he said—

Dula:  Where's there?

Amy:  Into my dad's room—my mom and dad's room.  And then he said, "Do you want to have some fun?" and I said, "Yes," and he said, "Ok, come here," and then he started to take off his pants.  I said, "What are you doing?" and he said, "Just come here and lick my thing,[2]" and I said, "Why?" and he said, "Just do it."  And I—I did it. [Be]cause I didn't want to be rude or anything [be]cause I have to obey my parents.  So I did it.  And then the next day, I told my mom while he wasn't there.

Dula:  Ok, then what happened?

Amy:  And then she said, "Ok, I'll deal with it and I'll make sure he doesn't do anything else but if he does, let me know."

---

[2]At this point in the video, Amy gestured toward her private area.

3

Later in the interview, Amy described the incident again and with more details. Amy told Dula that Woods said, "[Amy], come here," and that he was lying down on his bed with his hands behind his head when Amy came into his room, and then he sat up. When Amy responded, "What's wrong?" Woods asked her, "Do you want to have some fun?" to which Amy replied, "I do," and asked, "What are we going to do?" At that point, according to Amy, Woods stood up, went to the bathroom and urinated, took off his pants, lay down on the bed, and spread his legs. Amy described how Woods only had on a plain, white t-shirt at that point and that, when she asked, "What are you doing?" he said, "Come here and lick this." Amy continued to describe to Dula how she licked Woods's penis and how, while it was happening, Woods said things like "Oh that feels good," "I wish your mom would do this," and "Just keep going." Amy also described for Dula how Woods was "moving around" on the bed and pushing his hands against the furniture. She described Woods's penis as looking like a "hot dog," as brown with lots of wrinkles, and as having a little hole in it. Multiple times during the interview, Amy gestured between her own legs when describing or discussing Woods's penis. According to Amy, Woods eventually told her to stop, put his pants back on, told Amy, "Do whatever you want to do now," and went back to watching TV.

In the interview, Amy could not remember when the incident happened or exactly how old she was at the time, but she told Dula that "it was a long, long time ago" and that the last time she saw Woods was when she was five.

4

Amy said that this was the only time Woods told her to lick him, because she told Mariah the day after the incident. And when Dula asked Amy if Woods had ever touched her private parts or put his mouth on her private parts, Amy replied, "No."

## B. SANE examination with Stacy Henley

Stacy Henley, a Sexual Assault Nurse Examiner (SANE), examined Amy. At trial, Henley testified that Amy said,

> My dad hurt me all the time when I was little, all the way up until I was five. My dad left me when I was five. He thought it was fun for me taking off my pants and whooping me. My dad made me lick his middle part. He said that feels good, oh, keep going. He told me to - - he told me not to tell but I told my mom.

According to Henley, Amy said the forced oral sex only happened once.

## C. Woods's arrest and indictment

Woods was charged with the aggravated sexual assault of Amy by forcing her mouth to contact his penis when Amy was younger than six years old.

## III. The trial

### A. Amy's testimony

Amy was 11 years old when she testified at trial that Woods made her "lick his middle part" one day. Amy testified that she was in her bedroom when Woods called her to his bedroom, so she went to his room. Amy remembered that he took his pants and underwear off but could not remember what kind of shirt he was wearing. Amy described what happened next for the jury: "I said, What? And then he was like, Come here. And then I'm like, What? Then he said, come here and get on your

5

knees, and I got on my knees. And then he got on the bed and laid backwards and made me lick his middle part." She described Woods's penis as looking "[l]ike a stick." She did not remember if Woods said anything to her during the act.

Amy also could not remember when she told Mariah about the incident but did think the incident happened when she was "about five or six or four."

During cross-examination, Woods's counsel asked Amy if she had ever told Dula that she ran into her room and locked her door after Woods asked her to lick him. Amy responded that she did do that, but that it was "not about him licking - - not about [Amy] licking him." On redirect, the prosecutor asked what that was about and Amy clarified, "About him licking me," and that she did that because Woods wanted to lick her. Upon follow-up, she said that Woods licked her, although she could not remember when but knew it was not the same day that he forced her to lick him.[3]

### B. Kendra's testimony

Kendra, who was 16 by the time of trial, testified to Woods's abuse of her. She recalled meeting Woods when she was five and she and her older sister were staying at her grandfather's house while her parents were at work. Kendra testified that Woods told Kendra and her sister to take their clothes off, except for the t-shirts they had on (which were Woods's), and then showed them his penis. Kendra's mother testified

---

[3]Mariah testified that the only incident that Amy had disclosed to her was the incident when Woods forced Amy to perform oral sex on him.

that when she arrived to pick Kendra and her sister up that day, she was alarmed when she saw that both of them were wearing only t-shirts and the rest of their clothes were lying on the floor.

Kendra testified that Woods's abuse of her escalated when he moved into the house where Kendra lived with her parents. She recalled an instance when she was seven and Woods made her watch pornographic videos, and she testified that he regularly made her put her hands on his penis. Finally, Kendra testified that Woods performed oral sex on her more than five times and that he forced her to have vaginal and anal intercourse more than once. According to Kendra, Woods told her, "[I]t's okay because we're family."

### C. Expert testimony by Dr. Richard Schmitt

Woods's defense included testimony by Dr. Richard Schmitt, a psychologist. Dr. Schmitt testified that he reviewed the recording of Dula's forensic interview of Amy, read written statements of Mariah and Kendra, and reviewed "police information."

Dr. Schmitt expressed several concerns about Amy's outcry of abuse:

- Amy's age at the time of her outcry—she was nine—was concerning to Dr. Schmitt because children are "very suggestible" at that age, making it important for the interviewer to be "very careful" to avoid repetitive or leading questions. He also testified that children "do not have very good memory below age seven."

- Mariah, after Amy denied being touched inappropriately, asked the question a different way, at which point Amy disclosed the incident when Woods forced

her to perform oral sex. According to Dr. Schmitt, "many children will start to make up a story" when they are subjected to repetitive questioning.

- The four-year delay between the time when the incident took place and when Amy outcried was concerning to Dr. Schmitt.

- Amy's demeanor during the forensic interview with Dula concerned Dr. Schmitt, specifically her lack of "negative emotion," tears, or anger.

- In Dr. Schmitt's opinion, Dula appeared at times to be overly invested in the outcome of the interview.

- Dr. Schmitt noticed certain inconsistencies in Amy's statements during the forensic interview.

- In Dr. Schmitt's opinion, Amy's body language "did not suggest emotional pain" and neither did her words. He noted, "[T]here were no other nonverbal indicators such as tears," and described her posture as "very casual and relaxed."

The State recalled Dula to the stand to rebut Dr. Schmitt's testimony. Dula explained the research-based methodology she used with Amy and that she had used over the course of the 7,000 forensic interviews she had conducted in her career. Dula did not consider Mariah's questions to Amy as indicative of coaching. Dula explained that the absence of any negative or sad demeanor on Amy's part did not necessarily mean that she was not a victim of sexual abuse. Dula testified that children react to things differently and that, in her experience, "most often kids actually don't have emotion because they have had to deal with their abuse" over time, especially when—as here—there is a delay between the abuse and the time the child makes an outcry. She also explained that a child under the age of seven could remember a remarkable event like sexual abuse.

8

## D. The verdict

The jury found Woods guilty of aggravated sexual assault and found that Amy was younger than six years old at the time of the assault. The jury assessed a sentence of 45 years, and the trial court sentenced Woods accordingly.

## Discussion

Woods brings three points on appeal. His first point challenges the sufficiency of the evidence supporting his conviction. His second and third points relate to the admission of evidence. In his second point, Woods argues that the trial court erred by admitting evidence of a prior conviction during the punishment phase. In his third point, Woods argues that the trial court erred by admitting and permitting the State to show the jury the redacted forensic interview of Amy.

## I. Sufficiency of the evidence

In challenging the sufficiency of the evidence, Woods takes issue with Amy's, Dula's, and Henley's testimony at trial. In his estimation, Amy's testimony was "ambiguous" and "lacked any credibility" and Dula's and Henley's testimony were so weak as to amount to no more than a scintilla of evidence. We disagree.

### A. Standard of review

In our due process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct.

9

2781, 2789 (1979); *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Jenkins*, 493 S.W.3d at 599.

The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Blea v. State*, 483 S.W.3d 29, 33 (Tex. Crim. App. 2016). Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *See Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012). Instead, we determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App.), *cert. denied*, 136 S. Ct. 198 (2015). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Id.* at 448–49; *see Blea*, 483 S.W.3d at 33.

To determine whether the State has met its burden under *Jackson* to prove a defendant's guilt beyond a reasonable doubt, we compare the elements of the crime as defined by the hypothetically correct jury charge to the evidence adduced at trial. *See Jenkins*, 493 S.W.3d at 599; *Crabtree v. State*, 389 S.W.3d 820, 824 (Tex. Crim. App. 2012) ("The essential elements of the crime are determined by state law."). Such a

charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Jenkins*, 493 S.W.3d at 599. The law as authorized by the indictment means the statutory elements of the charged offense as modified by the factual details and legal theories contained in the charging instrument. *See id.*; *see also Rabb v. State*, 434 S.W.3d 613, 616 (Tex. Crim. App. 2014) ("When the State pleads a specific element of a penal offense that has statutory alternatives for that element, the sufficiency of the evidence will be measured by the element that was actually pleaded, and not any alternative statutory elements.").

We must consider all the evidence admitted at trial, even improperly admitted evidence, when performing a sufficiency review. *Jenkins*, 493 S.W.3d at 599; *Moff v. State*, 131 S.W.3d 485, 489–90 (Tex. Crim. App. 2004).

### B. Application

To obtain a conviction for aggravated sexual assault of a child, the State had to show that Woods caused Amy's mouth to contact his sexual organ and that Amy was under the age of fourteen. Tex. Penal Code Ann. § 22.021(a).

We disagree with Woods's characterization of Amy's testimony as "ambiguous." She testified that Woods forced her to lick his "middle part" when she was "about five or six or four" years old. The jury also had the benefit of viewing portions of the forensic interview with Dula in which Amy described the incident in

11

graphic detail, including Woods's mannerisms during the incident, statements he made during the incident, what he was wearing and not wearing, and what his penis looked like. Her testimony alone was sufficient to support the jury's conviction of Woods. *See id.*; Tex. Code Crim. Proc. Ann. art. 38.07 (West Supp. 2018) (providing that a conviction for aggravated sexual assault is supportable on the uncorroborated testimony of a child complainant); *Connell v. State*, 233 S.W.3d 460, 466 (Tex. App.— Fort Worth 2007, no pet.) (mem. op.) (holding complainant's testimony alone was sufficient to support conviction for indecency with a child).

As for Woods's assertion that Amy's testimony lacked credibility, that was within the jury's sole province to determine. *Bowden v. State*, 628 S.W.2d 782, 784 (Tex. Crim. App. 1982) (op. on reh'g) (explaining that the members of the jury are "the judges of the facts, the credibility of the witnesses, and the weight to be given to the testimony"). The jury clearly disagreed with Woods's arguments and we will not disturb their decision in this respect. *See Brooks v. State*, 323 S.W.3d 893, 911 (Tex. Crim. App. 2010) (rejecting the argument that reviewing courts can sit as the "thirteenth juror" by weighing the credibility of the evidence). We therefore overrule Woods's first point.

## II.  Admission of evidence

Woods's second and third points argue that the trial court erred by admitting certain evidence. In his second point, Woods argues that State's exhibits 6, 7, 8, and 9, records of an extraneous offense, were inadmissible during the punishment phase

because they were not sufficiently linked to Woods. In his third point, Woods argues that the trial court should not have admitted the video recording of Dula's forensic interview of Amy during the guilt or innocence phase.

We review the admission of evidence for an abuse of the broad discretion afforded to trial courts. *Winegarner v. State*, 235 S.W.3d 787, 790 (Tex. Crim. App. 2007); *Hammons v. State*, 239 S.W.3d 798, 806 (Tex. Crim. App. 2007). So long as the trial court's evidentiary ruling falls within the "zone of reasonable disagreement" and was correct under any applicable theory of law, we will uphold the ruling. *Winegarner*, 235 S.W.3d at 790.

## A. Evidence of a prior attempted-rape conviction

During the punishment phase, the State offered and the trial court admitted four exhibits reflecting a Lucas County, Ohio conviction of attempted rape against Lavoy Wendell Woods in 1991. State's exhibit 6 is a certified copy of a 1990 indictment from Lucas County, Ohio, against Lavoy Wendell Woods for forcing a girl under the age of 13 to engage in sexual conduct. State's exhibit 7 is a certified copy of the trial court's docket from the same Ohio proceedings against Lavoy Wendell Woods. State's exhibit 8 is a certified copy of a plea agreement signed by Lavoy Wendell Woods, in which he withdrew his former not guilty plea and pleaded guilty to a lesser-included offense of attempted rape. State's exhibit 9 is a certified copy of a 1991 judgment of conviction against Lavoy Wendell Woods reflecting that he pleaded

13

guilty to attempted rape, an aggravated second-degree felony, and was sentenced to "not less than seven, nor more than fifteen" years' imprisonment.

Evidence of a prior conviction is admissible during the punishment phase. Tex. Code Crim. Proc. Ann. art. 37.07, § 3(a)(1) (West Supp. 2018). But to be admissible, the evidence of a prior conviction must be linked to the defendant. *Flowers v. State*, 220 S.W.3d 919, 921 (Tex. Crim. App. 2007). In other words, the State must bring other evidence—independent of a certified copy of the judgment of conviction—that shows that the defendant is the same person named therein. *Davis v. State*, 268 S.W.3d 683, 715 (Tex. App.—Fort Worth 2008, pet. ref'd). There are several ways to carry this burden. One way is to provide "testimony of a witness who personally knows the defendant and the fact of his prior conviction and identifies him." *Beck v. State*, 719 S.W.2d 205, 209 (Tex. Crim. App. 1986).

Woods argues that the State did not sufficiently link the 1991 conviction to him.

Mariah testified during the punishment phase to her knowledge of Woods's prior conviction. Mariah testified that Woods disclosed the conviction when they were discussing an upcoming move out of state. She recalled Woods telling her that he had served 15 years in prison for a sex crime and that the conviction occurred in

14

Lucas County, Ohio, when he was 23 years old.[4]  She went on to recount his description of the crime:

> He said that what had happened was the girl was 17 years old and he was dating her sister and their relationship didn't work out.  And the sister got angry and asked her little sister to say that he touched her breast, and that he got a tougher sentence because the girls were daughters of a judge, and that it was for attempted rape but he never raped anyone.

Mariah testified that Woods told her that he had served 15 years in an Ohio prison and that he was on probation for 10 years after that and was required to register as a sex offender.  She recalled seeing paperwork related to the conviction and a time when he contacted his Ohio probation officer.  She also remembered taking Woods to register as a sex offender yearly and any time they moved, and she remembered that Woods was required to keep a card on him all the time that noted his sex offender status.

Mariah's detailed testimony was sufficient to demonstrate her personal knowledge of Woods's 1991 conviction for attempted rape and to support the admission of State's exhibits 6, 7, 8, and 9.  *See id.* at 209.  The trial court therefore did not abuse its discretion in admitting those exhibits, and we overrule Woods's second point.

---

[4]Woods would have been 23 years old in February 1991 when he was convicted.

15

**B. Dula's forensic interview of Amy**

Woods argues in his third point that the trial court erred by admitting the redacted video recording of Dula's forensic interview of Amy.

On the second day of trial, outside the presence of the jury, the State informed the trial court of its intent to offer the recording into evidence "based on the Defense opening statement and their cross-examination of [Amy and Mariah]." The State argued that Woods's counsel's opening statement laid out a defense that included emphasizing Amy's inconsistent statements during the forensic interview and their intent to call Dr. Schmitt to testify to children's motivations for fabricating sexual abuse allegations. The State argued that the video recording of the forensic interview was admissible as evidence of her "prior consistent statements." The trial court agreed that Woods's counsel "did open the door when [he] said that there were going to be inconsistent statements" and admitted the redacted video recording.

On appeal, the State offers the additional argument that the forensic interview recording was admissible under the rule of optional completeness. We agree in part, that a small portion of the redacted video recording was admissible under the rule of optional completeness. However, except for that small portion of the recording, we agree with Woods that the remainder of the recording was improperly admitted. But because we do not consider the trial court's error in admitting the video to be harmful, we will overrule Woods's third point.

### 1. Optional completeness

Hearsay is generally inadmissible. Tex. R. Evid. 802. The rule of optional completeness is a recognized exception to that rule:

> If a party introduces a part of an act, declaration, conversation, writing, or recorded statement, an adverse party may inquire into any other part on the same subject. An adverse party may also introduce any other act, declaration, conversation, writing, or recorded statement that is necessary to explain or allow the trier of fact to fully understand the part offered by the opponent.

Tex. R. Evid. 107; *see also Walters v. State*, 247 S.W.3d 204, 217–18 (Tex. Crim. App. 2007) ("This rule is one of admissibility and permits the introduction of otherwise inadmissible evidence when that evidence is necessary to fully and fairly explain a matter 'opened up' by the adverse party.").

It is generally recognized that when a portion of a videotaped conversation is inquired into by the defense, the State is entitled to offer any other portion of that conversation that is necessary to make the conversation fully understood. *Mick v. State*, 256 S.W.3d 828, 831 (Tex. App.—Texarkana 2008, no pet.) (citing *Credille v. State*, 925 S.W.2d 112, 117 (Tex. App.—Houston [14th Dist.] 1996, pet. ref'd)). Thus, under the rule of optional completeness, the State is entitled to admission of portions of the complainant's videotaped statement when (1) the defense attorney asks questions concerning some of the complainant's statements on the videotape, (2) the defense attorney's questions leave the possibility of the jury's receiving a false impression from hearing only a part of the conversation, with statements taken out of

17

context, and (3) the videotape is necessary for the conversation to be fully understood. *Credille*, 925 S.W.2d at 117; *see also Sauceda v. State*, 129 S.W.3d 116, 123 (Tex. Crim. App. 2004) (op. on reh'g) (recognizing *Credille* and noting that the defense in *Credille* pointed to *specific* statements by the complainant during a recorded interview "which, taken out of context, could indeed have created 'the possibility of the jury receiving a false impression'").

Woods's counsel's strategy in cross-examining Amy was to impeach her credibility by pointing out inconsistencies between her trial testimony and her statements during the forensic interview, especially her assertion at trial that Woods had performed oral sex on her. In doing so, Woods's counsel misrepresented a statement made by Amy during the forensic interview by suggesting that Amy told Dula that she had run into her room and locked the door one time after Woods asked her to lick him. But defense counsel had it backwards.

In the interview Amy told Dula that she had run to her room and locked the door after Woods had offered to perform oral sex on Amy. Amy told Dula,

> He said, "Do you want me to do it to you?" and I said, "No," and he said, "Just do it!" and I said, "I don't want to!" So I ran to my room and locked the door so he couldn't do it. And then when he said, "Ok, I won't do it," I unlocked the door and started watching TV and he walked in there and started saying, "I'm sorry."

Yet, on cross-examination, defense counsel urged otherwise:

> Q. . . . Do you remember telling Lindsey - - again, the lady in the room - - that your father asked you to come into the room and asked you to

18

do something, that you said no and you went and locked yourself in your room? Do you remember that?

Do you want me to ask the question differently?

A. Yes, sir.

Q. Okay. Do you recall when you were looking at that little recording of you and Lindsey that there was a time on there where you told Lindsey that your father asked you to perform an act, you said no and you ran into your room and locked the door? Do you remember saying that?

A. I don't remember saying that. I just don't remember what he asked me to do.

Q. Okay. Well, make sure - - I'll refresh your memory a little bit.

There was a time when apparently your father asked you to lick him like you described and you said, No, I won't do it. You ran into your room and you locked the door. Do you remember that?

A. I remember saying no and then locked myself in the room, but I don't remember him saying it because - - well, yes, I do remember but not about him licking - - not about me licking him.

Q. Okay. I'm confused then. So you do remember going and locking yourself in your room, right?

A. Yes, sir.

Q. And eventually you came out of your room and you said nothing happened. Do you remember saying that - -

A. Yes.

Q. - - nothing happened between you and your father, right?

A. Yes. Yes, sir.

After the State attempted to clarify Amy's statements to Dula on redirect, Woods's defense counsel doubled-down, again creating the false impression that Amy had said the opposite:

> [Q.]  You just said when [the prosecutor] was asking you a question about the incident where you locked yourself in your room, right?
>
> A.  Yes, sir.
>
> Q.  Okay.  And you told her that was because your dad wanted to lick you, do you remember saying that to her?
>
> A.  Yes, sir.
>
> Q.  But isn't it true you told Ms. Dula that's not what happened. It was because he asked you to lick him that one time; do you remember?
>
> . . . .
>
> . . . You told Lindsey, the lady in the little room, that that was in response to your father asking you to lick him, not the other way around?
>
> A.  It's the other way around.
>
> Q.  But did you - - did you tell Lindsey it was the other way around?
>
> A.  I don't remember saying that.
>
> Q.  Okay.  Is it possible you did?
>
> A.  Maybe, but I don't remember that.

The rule of optional completeness entitled the State to clarify defense counsel's suggestion that Amy told Dula she had run away from Woods when he asked her to lick him by introducing into evidence the clarifying portions of the interview in

question. Tex. R. Evid. 107. Thus, that portion of the recorded interview in which Amy told Dula that she had run away from Woods when he asked to lick her was admissible, and the trial court did not err by admitting that portion of the recorded interview into evidence. *See Tovar v. State*, 221 S.W.3d 185, 191 (Tex. App.—Houston [1st Dist.] 2006, no pet.). We therefore overrule Woods's third point as it relates to this portion of the recorded forensic interview.

### 2. Recent fabrication

But the rule of optional completeness goes only so far. Tex. R. Evid. 107 (permitting only such evidence which is "necessary to explain or allow the trier of fact to fully understand the part offered by the opponent"). Just because defense counsel opened the door to the admission of a small portion of the forensic interview does not render the entire interview admissible. *Sauceda*, 129 S.W.3d at 123 (rejecting the State's argument "that the 'opening of the door' would require the automatic admission of the entire videotape" as being "completely without support"). The State does not explain how the remainder of Woods's counsel's questions created any false impressions, nor can we discern any such false impressions in our review of the record. The rule of optional completeness therefore does not apply to allow the admission of the rest of the video.

At trial, the State argued that the redacted forensic interview recording was admissible under rule 801(e)(1)(B). Rule 801(e)(1)(B) allows the admission of a witness's prior consistent statement under three limited circumstances: when

21

"offered to rebut an express or implied charge that the declarant recently fabricated [her testimony] or acted from a recent improper influence or motive." Tex. R. Evid. 801(e)(1)(B). At the time of the State's proffer, the State offered the video recording to rebut the defense's charge of "fabrication." But in so doing, the State wholly ignored the temporal component of the rule, i.e., that the alleged fabrication be of *recent* origin.

As the United States Supreme Court explained in discussing the federal counterpart to this rule, "Prior consistent statements may not be admitted to counter all forms of impeachment or to bolster the witness merely because she has been discredited." *Tome v. United States*, 513 U.S. 150, 157, 115 S. Ct. 696, 701 (1995). The temporal requirement is important:

> [T]he forms of impeachment within the Rule's coverage are the ones in which the temporal requirement makes the most sense. Impeachment by charging that the testimony is a recent fabrication or results from an improper influence or motive is, as a general matter, capable of direct and forceful refutation through introduction of out-of-court consistent statements that predate the alleged fabrication, influence, or motive. A consistent statement that predates the motive is a square rebuttal of the charge that the testimony was contrived as a consequence of that motive.

*Id.* at 158, 115 S. Ct. at 701. As the Court has explained, for prior consistent statements to be admissible, (1) the declarant must testify at trial and be subject to cross-examination; (2) there must be an express or implied charge of *recent* fabrication or improper influence or motive of the declarant's testimony by the opponent; (3) the proponent must offer a prior statement that is consistent with the declarant's

22

challenged in-court testimony; and, (4) the prior consistent statement must be made prior to the time that the supposed motive to falsify arose. *Hammons*, 239 S.W.3d at 804 (citing *Tome*, 513 U.S. at 156–58, 115 S. Ct. at 700–01).

The court of criminal appeals has likewise instructed us that "the rule cannot be construed to permit the admission of what would otherwise be hearsay any time a witness's credibility or memory is challenged. Were that true, mere cross-examination would always turn the prior consistent statement into non-hearsay." *Id.* at 805 (citations omitted).

Woods's counsel did not imply that Amy recently fabricated her statements. Rather, he merely questioned her recollection as to certain statements she made to Dula in the interview, including: (1) whether she told Dula that she reported the incident to her mother the morning after it took place; (2) whether she told Dula that Woods asked her to lick him only one time; (3) whether she told Dula that Woods was not wearing underwear at the time of the incident; and (4) whether Amy told Dula about an incident at school with a male classmate.

Woods's trial strategy was largely focused upon convincing the jury that Amy fabricated the entire offense from the beginning, not that she changed her story later on, which is the situation to which rule 801(e)(1)(B) is intended to apply. *See Tome*, 513 U.S. at 158, 115 S. Ct. at 701; *Hammons*, 239 S.W.3d at 804; *see also Klein v. State*, 273 S.W.3d 297, 316–17 (Tex. Crim. App. 2008) (holding prior consistent statements of abuse by child complainant were admissible when child claimed during her

23

testimony that her allegations of abuse were "improperly influenced by the State's trickery in questioning her"). The trial court therefore abused its discretion by admitting the entire redacted forensic interview recording.

### 3. Harmless error

Having found error, we must conduct a harm analysis to determine whether the error calls for reversal of the judgment. Tex. R. App. P. 44.2. Because the erroneous admission of evidence is not constitutional, we apply rule 44.2(b) and disregard the error if it did not affect appellant's substantial rights. Tex. R. App. P. 44.2(b); *see Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g), *cert. denied*, 526 U.S. 1070 (1999). A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)). Conversely, an error does not affect a substantial right if we have "fair assurance that the error did not influence the jury, or had but a slight effect." *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).

In making this determination, we review the record as a whole, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). We may also consider the jury instructions,

24

the State's theory and any defensive theories, whether the State emphasized the error, closing arguments, and even voir dire, if applicable. *Id.* at 355–56.

Error in the admission of evidence is generally considered harmless when other properly admitted evidence provides the same facts to the jury. *Land v. State*, 291 S.W.3d 23, 29 (Tex. App.—Texarkana 2009, pet. ref'd) ("In situations where a video recording is improperly admitted, yet the recording is cumulative of the victim's properly admitted live testimony on the same issue, courts often disregard the error, reasoning that it could not have affected the appellant's substantial rights."). In *Matz v. State*, 21 S.W.3d 911, 912–13 (Tex. App.—Fort Worth 2000, pet. ref'd), this court held in considering a conviction for aggravated sexual assault of a child that the admission of a videotape of the child complainant was harmless error because it essentially repeated the child's in-court testimony and that of the doctor who performed the sexual assault examination.

The most important part of the video—Amy's description of the incident of abuse—largely resembled Amy's in-court testimony and her descriptions as testified to by Mariah and Henley. Amy testified at trial that Woods called her into his room one day and made her lick his middle part while he was on the bed and she was on her knees and that she went back to her bedroom afterward. Mariah testified that Amy told her that Woods made Amy lick his middle part. And Henley testified that Amy told her the same and also told her that Woods said "[T]hat feels good, oh, keep going," and told Amy not to tell Mariah. Although Amy's description of the events in

25

the forensic interview provided more detail than her trial testimony, it provided essentially the same story and we find it unlikely that the jury was inclined to reject Amy's story of sexual abuse but changed its mind after hearing it again in the recording. *See Todd v. State*, Nos. 02-12-00114-CR, 02-12-00115-CR, 2013 WL 1457735, at *5 (Tex. App.—Fort Worth Apr. 11, 2013, pet. ref'd) (mem. op., not designated for publication) (holding that erroneous admission of forensic interview video, in which child described abuse with more detail, was harmless); *see also Shaw v. State*, 122 S.W.3d 358, 364 (Tex. App.—Texarkana 2003, no pet.) ("Because the State sufficiently proved the fact to which the hearsay relates by other competent and unobjected-to evidence . . . , we hold the admission of the hearsay constituted nonreversible error."). We hold that the admission of this part of the video did not constitute reversible error.[5] *See Matz*, 21 S.W.3d at 912–13.

We therefore conclude that, in the context of the entire case against Woods, the trial court's error in admitting the video of the forensic interview did not have a substantial or injurious effect on the jury's verdict and did not affect Woods's substantial rights. *See King*, 953 S.W.2d at 271. Thus, we disregard the error, *see* Tex. R. App. P. 44.2(b), and overrule the remainder of Woods's third point.

---

[5]To the extent the video goes beyond Amy's description of events—it included a ten-minute "getting to know you" discussion between Amy and Dula, a discussion of an incident when Amy fell at the park and Woods assisted her, identification of Amy's private parts, a discussion about an incident at school with a male classmate, and Amy's discussion of her relatives, pets, and general home life—Woods does not argue, and we do not view the admission of these portions of the interview as rising to the level of harmful error, either.

## Conclusion

Having overruled each of Woods's three points, we affirm the trial court's judgment.

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  October 25, 2018